CARLSON, Presiding Justice,
for the Court:
¶ 1. Johnny R. Young, Jr., was convicted in the Circuit Court of Union County on three counts of sexual battery of his minor daughter and was sentenced to three concurrent life sentences. We assigned Young’s appeal to the Court of Appeals, which unanimously affirmed. Young v. State, 106 So.3d 811 (Miss.Ct.App.2011), reh’g denied (Feb. 7, 2012). We granted certiorari to consider two of Young’s issues and find that: (1) the circuit court did not err by admitting evidence that Young had sexually assaulted his stepsister when she was five and he was fifteen, because the circuit court found the prior assault probative of a noncharacter issue under Mississippi Rule of Evidence 404(b); and (2) the sexual-assault nurse examiner who examined Cindy was amply qualified by her training and experience to testify regarding the cause of the hymenal tear or rupture that she had observed while examining Cindy. Thus, we affirm the judgments of the Union County Circuit Court and of the Court of Appeals.
FACTS AND PROCEEDINGS IN THE TRIAL COURT AND THE COURT OF APPEALS
¶ 2. Johnny Young’s eight-year-old daughter, Cindy,[1] told Richard Dunsford, a family friend, as well as her paternal step-grandmother, that Young had sexually assaulted her many times over several years. The Union County Sheriffs Office and Child Protective Services investigated the allegations of abuse, and Angie Floyd, a forensic-interview specialist with the Children’s Advocacy Center in Tupelo, interviewed Cindy. During the videotaped interview, Cindy stated that Young had abused her. As a result of this interview, Young was arrested and indicted on three counts of sexual battery of a minor that allegedly occurred between November 3, 2005, and November 3, 2006.
¶ 3. Before trial, Young asked the trial court to exclude any testimony of prior sexual acts alleged to have occurred twenty years earlier between him and his half-sister, Anna Smith. The trial judge ruled the testimony admissible under Mississippi Rules of Evidence 403 and 404(b), adding that he would instruct the jury of the purpose of Anna’s testimony. At trial, Anna testified that, twenty years earlier, when she was five years old and Young was fifteen years old, Young had removed her panties and then his shorts and had rubbed his exposed penis on her vagina. The trial judge instructed the jury as follows:
The testimony of the state’s witness, [Anna], which is not part of charged conduct in this case, is to be used for the purpose of establishing motive, intent, plan, knowledge, identity, or absence of mistake or accident on the part of the defendant JOHNNIE R. YOUNG and should not be considered as proof of the defendant’s character or to show that he acted in conformity therewith.
¶ 4. During direct examination, Cindy acknowledged that she had been interviewed by Floyd and stated that everything she had said during the forensic-interview video[2] was true. According to Cindy’s video interview with Floyd, Young had sexually abused her on many occasions, which included penetrating her vagina, anus, and mouth. During the interview, Cindy drew pictures of her father’s body parts along with her body parts, tell *777 ing Floyd that her father had placed “his bottom” on “her bottom.”
¶ 5. When the State listed Elizabeth Thomas, a sexual-assault nurse examiner, as an expert witness, Young objected to Thomas’s qualifications to offer any opinion on causation. The State responded that Thomas would not offer any opinion on causation, but would testify only to what she had observed while examining Cindy. Accordingly, the trial judge ruled that Thomas could testify “within the limitations of a sexual assault nurse.”
¶ 6. When the prosecutor asked Thomas about the significance of the removal of or injury to the hymen during sexual activity, Young again objected, and the trial judge overruled the objection. Thomas opined that “there could be an acute injury” or “a gradual wearing away depending on the thickness of the object.” Thomas also provided expert opinions about the causes of early estrogenization and of an absence of hymen at six o’clock; the hymen’s ability to heal itself, estrogen’s effects on the hymen, and the ability to have intercourse without injury or pain; and the cause for the tear or rupture and attenuation in Cindy’s hymen. Likewise, Thomas testified that Cindy’s exam was “consistent with [a] history of blunt penetrating trauma of the oral, rectal, hymen, and/or vaginal orifice.”
¶ 7. The jury convicted Young on all three counts of sexual battery of a minor, and the circuit court sentenced him to three concurrent life sentences. After his post-trial motions were denied, Young timely appealed, raising eight issues. Young asserted that the trial court erred: (1) by allowing evidence of Cindy’s out-of-court-statements; (2) by allowing evidence of Young’s prior sexual misconduct; (8) by allowing Angie Floyd to testify as an expert; (4) by allowing Thomas’s medical testimony; (5) by excluding Dr. Gary Mooers’s expert testimony; (6) by failing to grant a limiting instruction or a mistrial for the prosecution’s improper closing argument; (7) by denying Young’s motion for a judgment notwithstanding the verdict, or in the alternative, motion for a new trial; and (8) by committing cumulative errors which required reversal. The Court of Appeals affirmed the trial court on all issues.
¶8. We granted certiorari to consider only the second and fourth issues: the evidence of Young’s prior sexual misconduct and Nurse Thomas’s testimony. We agree with the Court of Appeals’ analysis and disposition of the other issues. Young v. State, 99 So.3d 189, 197 (¶32) (Miss.Ct.App.2011). See Harness v. State, 58 So.3d 1, 4 (Miss.2011) (under Mississippi Rule of Appellate Procedure 17(h), this Court may limit the question for review upon grant of certiorari).
DISCUSSION
I. The trial court’s admission under Mississippi Rule of Evidence 404(b) of the evidence of Young’s prior sexual assault of his stepsister is squarely in line with this Court’s recent precedent.
¶ 9. We apply an abuse-of-discretion standard when reviewing a trial court’s ruling on the admissibility of evidence. Hargett v. State, 62 So.3d 950, 952 (Miss.2011). And when a trial court abuses its discretion on evidentiary issues, we reverse only where “a substantial right of a party is affected.” Miss. R. Evid. 103(a).
¶ 10. The evidentiary ruling at issue here is Anna’s testimony that Young fondled her twenty years earlier, when she was five years old and Young was fifteen. Young argues that (1) the alleged incident was too remote in time, and too different from the events alleged by Cindy, to have *778 any noncharacter purpose; and (2) any probative value the evidence had was substantially outweighed by the danger of unfair prejudice. We disagree.
¶ 11. With certain limited exceptions that do not apply here, our rules of evidence prohibit the use of “[e]vidence of a person’s character or a trait of his character” to prove “that he acted in conformity therewith on a particular occasion....” Miss. R. Evid. 404(a). The trial judge admitted Anna’s testimony under Mississippi Rule of Evidence 404(b), which provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Miss. R. Evid. 404(b).
¶ 12. We find that the evidence of Young’s prior sexual assault of his half-sister satisfied Mississippi Rule of Evidence 404(b). The rule that we enunciated in Derouen v. State, 994 So.2d 748 (Miss.2008), requires that evidence of prior sexual misconduct must satisfy Rule 404(b), be filtered through Rule 403, and be accompanied by a limiting instruction. Id. at 756. In two recent cases, we further addressed the very issue before us today — whether, where a defendant was on trial for sexual misconduct involving a prepubescent female family member, evidence that he had engaged in sexual misconduct with multiple female family members when they also were near the age of puberty was admissible for a noncharacter purpose under Rule 404(b) — and found that the evidence was properly admitted.[3] Gore, 37 So.3d 1178; *779 Green, 89 So.3d 543. Like Gore and Green, this case involves evidence that the defendant sexually abused a female family member — his half-sister — years before the sexual abuse of another female family member — his daughter — that is at issue in this case. Our recent analysis of the very issue presented in this case is directly applicable to our decision today. Consistent with Gore and Green, we find that the trial court did not abuse its discretion by admitting the evidence of the defendant’s prior sexual misconduct involving another female family member.
¶ 13. In Green, we explicitly found that, while Rule 404(b) requires that evidence of prior bad acts be presented for some purpose other than character; “the trial court’s failure to identify the specific applicable exception(s) under Rule 404(b) does not require reversal.” Green, 89 So.3d at 551 (citing Gore, 37 So.3d at 1186). Thus, though the dissent expresses frustration with what it dubs a “shotgun approach” (i.e. recital of all of the noncharacter purposes listed in Rule 404(b) as the purposes for admitting prior-bad-act evidence), its frustration does not warrant reversal.
¶ 14. Gore and Green reveal that the evidence of Young’s prior sexual assault of his half-sister was admissible for non-character purposes under Rule 404(b). In Gore, we recognized that evidence of prior sexual misconduct is admissible under Rule 404(b) where it discloses as the defendant’s motive “a seemingly uncontrollable desire to partake in pedophilic sexual activities with young and developing female juveniles,” and where the “defendant’s means of accomplishing these aetivities on past occasions bear substantial resemblance to each other and with the present offense.” Gore, 37 So.3d at 1186 (quoting Derouen, 994 So.2d at 755; Lambert v. State, 724 So.2d 392, 395-96 (Miss.1998) (Mills, J., dissenting) (quoting State v. Driggers, 554 So.2d 720, 726 (La.Ct.App.1989))) (emphasis added).
¶ 15. Similarly, in Green, we found that “the ‘overwhelming similarities’ between these other sexual offenses ... and the incidents at issue undeniably bring the [evidence of prior sexual assaults] within the purview of admissibility under Rule 404(b).” Green, 89 So.3d at 550. In that case, we further explained examples of purposes for which evidence of prior sexual assaults may be admitted under Rule 404(b), including “a common plan, scheme, or system ... utilized ... repeatedly to perpetrate separate but very similar crimes,” such that “[o]ne could infer from these common features that defendant had a system that involved taking advantage of the parent-child relationship, particularly his control over his daughters, to perpetrate abuse.” Green, 89 So.3d at 550 n. 19 (citations omitted) (emphasis added).
¶ 16. We also addressed the use of evidence of prior sexual misconduct to show motive — which we noted “involves ‘[a]n impulse, as an emotion, desire, or psychological need, acting as incitement to action’ ”— and found that “[t]he ‘seemingly uncontrollable desire to partake in pedophilic sexual activities with young and developing female juveniles[,]’ is probative regarding motive.” Green, 89 So.3d at 550-51 n. 19 (citing Webster’s II New College Dictio *780 nary at 715; Gore, 37 So.3d at 1186 (quoting Driggers, 554 So.2d at 726)) (emphasis added). Thus, we provided in Gore and Green that evidence of prior sexual misconduct involving a female family member is admissible for noncharacter purposes where it shows motive, similar means, or a common plan, scheme, or system for the sexual abuse of the female family member for which the defendant is on trial.
¶ 17. Our analysis in Gore and Green is directly applicable to the case before us today. As in those cases, the trial court here did not abuse its discretion by admitting evidence of Young’s previous sexual abuse of another prepubescent female family member, because the evidence was admissible for noncharacter purposes. Those purposes include establishing that Young’s motive was a “seemingly uncontrollable desire to partake in pedophilic sexual activities with young and developing female juveniles” and that both assaults were part of a “common plan, scheme, or system” that involved Young taking advantage of family relationships to engage in sexual activities with prepubescent girls.
¶ 18. The Court of Appeals properly recognized that, “while the incident with [Young’s half-sister] occurred twenty years ago, it shows similar behavior on the part of the defendant and that the victims were of a similar age” and found that there was “no abuse of discretion in the circuit court’s admission of this evidence.... ” Young v. State, 106 So.3d 811, 817-18 (Miss.Ct.App.2011). Because this evidence was “properly admitted under Rule 404(b), filtered through Rule 403, and accompanied by an appropriately-drafted limiting or cautionary instruction to the jury,” we affirm the Court of Appeals’ finding that this issue is without merit. Derouen, 994 So.2d at 756.
II. Because of her sexual-assault-nurse-examiner training and extensive experience in sexual-assault examination, Nurse Thomas clearly was qualified to testify regarding the injuries that she had observed when examining Cindy.
¶ 19. Young argues that Nurse Elizabeth Thomas testified repeatedly to medical causation and gave opinions not disclosed before trial. For example, according to Young, Thomas gave medical opinions about early estrogenization by implying that Cindy’s sexual activity could cause and account for her level of estro-genization; about how the absence of hymen at six o’clock was generally caused by sexual assault or sexual penetration; about the ability of the hymen to heal itself and the ability to have intercourse without injury or pain; about the effects of estrogen on the hymen; about hymen size and sexual activity; and about the cause of the tear or rupture and attenuation in Cindy’s hymen. The trial judge also allowed Thomas to opine that Cindy’s injuries were “consistent with blunt penetrating trauma of the vaginal area and the anal area.”
¶ 20. Before Thomas testified, Young secured an admission from Thomas that she was not qualified to determine issues of medical causation. The State informed the trial judge that Thomas would not be testifying to causation, but would testify only as to what she had observed. The trial judge ruled that Thomas could testify within her limitations as a sexual-assault nurse examiner and could give limited opinions, but the judge did not explain those limitations.
¶ 21. We note that Thomas’s testimony fell well within her realm of particular expertise. At the time of trial, Thomas had been employed as a sexual assault nurse examiner (“SANE”) at the Memphis Sexual Assault Research Center in Mem *781 phis, Tennessee, for sixteen years, and she had been a registered nurse for thirty-two years. Thomas received an Associate Degree in Nursing from Memphis State (now the University of Memphis), a Bachelor’s of Nursing from Union University, and a Master’s of Nursing from the University of Tennessee. Thomas stated that, in order to be a SANE at her center, she needed a master’s degree and additional didactic or theory training, and had to perform fifteen examinations on children and fifteen examinations on adults before she was allowed to practice on h,er own. Thomas also received post-master’s-degree training in medical legal investigation from the St. Louis School of Medicine and earned an additional master’s degree in that field. She also is certified in psychiatric mental health and has taught for more than fifteen years at the University of Memphis School of Nursing. In addition, Thomas’s training is bolstered by an additional twelve hours of continuing education courses per year. Thomas had occasion to make physical examinations of the genitalia of nearly 3,000 persons — two-thirds to three-quarters of those being children. She had been tendered, and accepted, as an expert witness in the area of physical examination of female genitalia and as a SANE nurse numerous times over a period of years in Mississippi, Arkansas, and Tennessee.
¶ 22. Thomas asserted during her voir dire that a SANE nurse was not qualified to determine issues of medical causation. She made assessments and observations and rendered opinions, but did not make a medical diagnosis or assign treatment. Instead, the supervising physician, in this case Dr. Claudette Shepard, made a final determination as to ultimate causation, medical diagnosis, and treatment. Thomas agreed with Young’s attorney during voir dire that she was able to provide or give an opinion only concerning the degree of certainty as to “consistent with,” and not as to causation.
¶ 28. Young objected to Thomas’s qualifications to offer any causation opinion, and the State responded that Thomas would not offer any causation testimony, but would testify only as to what she had observed while examining Cindy. The trial judge ruled that Thomas was “imminently [sic ] qualified [to testify] within the limitations of a sexual assault nurse.” In so doing, the trial judge clearly instructed Nurse Thomas not to testify as to medical diagnosis and treatment, consistent with Mississippi caselaw. He specifically instructed Thomas not to testify that the condition was caused by sexual abuse, and a perusal of the record indicates that Thomas did indeed testify within these proper limitations. Thomas’s expert testimony at trial was that Cindy’s injuries were consistent with blunt force trauma. At no point did she assert that Cindy’s injuries were caused by sexual assault or penetration of the genitalia.
¶ 24. In fact, none of Thomas’s testimony constituted a conclusion or opinion as to medical causation under Mississippi law. In Richardson v. Methodist Hospital of Hattiesburg, Inc., 807 So.2d 1244, 1248 (Miss.2002), Linda Richardson filed a personal-injury and wrongful-death action against Methodist Hospital of Hattiesburg, Inc. (Methodist), claiming that her mother, Vivian Wheeless, died as a result of Methodist’s negligent failure to provide adequate care, including adequate nursing care. Richardson, 807 So.2d at 1245. The plaintiffs expert was Crystal D. Keller, a registered nurse (RN) and Certified Legal Nurse Consultant, who testified to the appropriate nursing standards of care and that deviations from them led to the decedent’s suffering and subsequent death. Id. The trial court granted summary judgment to Methodist.
*782 ¶ 25. On appeal, we held that “the trial court’s ruling was overly restrictive in not allowing Keller to testify concerning the appropriate standard of nursing care and the deviations from that standard.” Id. at 1246. We noted that “[t]he fact that Keller is not a physician does not bar her right to testify concerning the standard of care for the nursing staff, but more appropriately may affect the weight of her testimony, which is an issue for the trier of fact.” Id. at 1247. However, we stated that Keller was “not qualified to testify concerning the causal nexus between these deviations and Wheeless’s death.” Id. at 1247-48. Although we did not “require expert testimony by a medical doctor in order to establish the cause of death,” we held that “[t]he cause of a stroke ... is a complex medical issue” and that Keller “lacks the requisite education and experience as an expert to testify concerning the causal link between Wheeless’s death and the alleged deviations in nursing care.... ” Id. at 1248. Thus, our limited holding in Richardson was that Keller was not qualified to testify to such a causal link, given Keller’s particular education and expertise under the facts presented.
¶ 26. Our decision in Vaughn v. Mississippi Baptist Medical Center, 20 So.3d 645 (Miss.2009), likewise does not suggest that Nurse Thomas’s testimony was improper. In Vaughn, the trial court found that the plaintiff had failed to establish the necessary element of proximate cause, based on its finding that Vaughn’s designated expert — Crystal Keller, R.N., the same nurse at issue in Richardson — was not qualified to testify as to whether the negligent acts of Mississippi Baptist Medical Center (Baptist) had proximately caused Vaughn’s staph infection. Vaughn, 20 So.Sd at 652 (Miss.2009). In Vaughn, it was undisputed that a staph infection had developed in Vaughn’s surgical wounds, but the parties disputed when the infection developed. Baptist cited Richardson for the proposition that “a nurse is not qualified to testify as to whether the deviation in the standard of care caused Vaughn’s staph infection[,]” and we noted that Keller was not qualified to diagnose a staph infection. Id. at 651.
¶ 27. We found that Richardson “explicitly held that a nurse cannot testify as to cause of death,” and that “Richardson should be interpreted as having made impermissible any testimony from a nursing expert on diagnostic impressions, because nurses are not qualified to make medical diagnoses or attest to the causes of illnesses.” Id. at 652. In that context, we held that “nurses cannot testify as to medical causation.” Id. We explained this holding as logically following from the fact that “medical diagnosis is outside a nurse’s scope of practice,” and we stated that the holding was “in keeping with the majority rule that nursing experts cannot opine as to medical causation and are unable to establish the necessary element of proximate cause.” Id. (citations omitted). In light of our qualification in Vaughn, it should be readily apparent that, in today’s case, Thomas’s carefully limited, noncausation testimony dealing with matters that pertained to her area of profound expertise did not fall within the realm of testimony that nurses cannot give under Vaughn.[4]
*783 ¶ 28. Since Vaughn was handed down, this Court has continued to consider SANE testimony like that offered by Nurse Thomas in the instant case. In Harden v. State, 59 So.3d 594 (Miss. 2011), we noted that “[SANE Elizabeth] Thomas testified that her physical examination of [the victim] revealed recent blunt penetrating trauma in the genital and rectal areas. Thomas admitted on cross-examination that she could not identify the object of penetration from her physical examination.” Harden, 59 So.3d at 600. The resemblance of this testimony to Thomas’s testimony in today’s case is apparent. In weighing the evidence in Harden, we considered the effect of this testimony, noting that “the jury was confronted with ... the results of the physical examination of [the victim], which revealed recent blunt penetrating trauma.” Harden, 59 So.3d 594 at 610. It is clear that this Court has never interpreted Vaughn as barring testimony like that offered by Nurse Thomas in the instant case.[5]
¶ 29. We further note that in sexual-assault cases, many of our sister states allow SANEs to register testimony similar to that of Nurse Thomas in this case. In fact, we are unable to find a single state whose caselaw prohibits SANEs from testifying to causation at sex-crime trials. For example, the Supreme Court of Virginia has “recognized an exception to the general rule that only a medical doctor may render an opinion regarding the cause of a physical human injury.” John v. Im, 263 Va. 315, 321, 559 S.E.2d 694, 697 (2002) (citation omitted). The Virginia court recognized that “although the SANE was not a medical doctor, she was qualified under the facts presented to render an expert opinion concerning the ‘causation of injuries in the context of an alleged sexual assault’ however, the court took pains to note that the holding “is limited to the unique context of a SANE’s expert opinion concerning the causation of injuries in a sexual assault case; that holding does not change the general rule ... that only a medical doctor may give an expert opinion about the cause of a physical human injury.” Id. (citations omitted).[6] In today’s case, Thomas, a sexual-assault nurse examiner, did not testify as to what caused Cindy’s injuries; her testimony was only that those injuries were consistent with blunt, penetrating trauma. To follow the dissent’s path and exclude this evidence would make Mississippi easily the most restrictive state in the Union regarding the admission of SANE testimony.[7]
*784 ¶ 30. Such a position is unjustifiable, given the degree of exposure that SANEs receive — not only to sexual assaults, but to the legal process — by their training and experience. The International Association of Forensic Nurses (“the IAFN”), which administers the board certification exam to become a SANE, defines SANEs as “registered nurses who have completed specialized education and clinical preparation in the medical forensic care of the patient who has experienced sexual assault or abuse.”[8] Becoming a SANE requires specialized training: the “eligibility requirements include the completion of a 40 hour classroom training that meets the IAFN education guidelines. The nurse must then also complete a clinical component to that training to assure that she is competent to care for sexual assault patients.”[9] A SANE’s role as a witness is literally part of the job description: the IAFN, in its online explanation of the SANE role, provides that a “SANE also can testily in any legal proceedings related to the [sexual assault] examination.”[10] The Mississippi Coalition Against Sexual Assault (“MSCA-SA”) states succinctly that:
A S.A.N.E. is a registered nurse with at least forty hours of specialized training. The training enables the RN to:
*Provide comprehensive care to sexual assault victims,
*Conduct a forensic exam, &
*Testify effectively in court
The Sane program benefits a sexual assault victim by streamlining the process of providing comprehensive medical treatment while facilitating the collection of evidence.[11]
SANE course objectives include the requirements to “[r]eview the process of evidence evaluation by the criminalist ...” and to “[rjeview the roles and responsibilities of the criminal justice system including the laws of Mississippi, the criminal justice process, prosecution strategies, defense strategies and SANE testimony techniques.”[12] Indeed, according to a brochure produced by MSCASA and made available on its website, the SANE course includes a mock trial.[13]
¶ 31. To restrict the testimonial privileges of these professionals almost out of existence in their own field of specialization might well have dire consequences for trial practice in Mississippi. Although, in this instance, Nurse Thomas was supervised by a physician, nothing in the record indicates that this will be the case for every SANE or every reasonably well-equipped sexual-assault center.' To restrict SANEs from testifying as to sexual assault would set a dangerous precedent, forcing supervising physicians to devote more of their valuable time to trial work, and making it more difficult for rape victims to achieve justice, while failing to provide any useful protections to sexual-assault defendants. We affirm the Court *785 of Appeals’ finding that this issue is without merit.[14]
CONCLUSION
¶ 32. Based on today’s discussion, we affirm the judgments of the Circuit Court of Union County and the Court of Appeals.
¶ 33. THE JUDGMENTS OF THE COURT OF APPEALS AND THE CIRCUIT COURT OF UNION COUNTY ARE AFFIRMED. COUNT I: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCES SHALL RUN CONCURRENTLY WITH EACH OTHER WITH CONDITIONS.
RANDOLPH, LAMAR AND PIERCE, JJ., CONCUR. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J.; KITCHENS AND KING, JJ., JOIN IN PART. WALLER, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED IN PART BY DICKINSON, P.J. KITCHENS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER AND KING, JJ.; DICKINSON, P.J., JOINS IN PART.

. We use this alias to protect the girl’s identity-

. Cindy’s forensic-interview video was played for the jury.

. In Gore v. State, 37 So.3d 1178 (Miss.2010), the defendant was on trial for “gratifying his lust or indulging his depraved licentious sexual desires” by rubbing his twenty-one-month-old granddaughter with his body, based on testimony that the defendant had been found lying in bed naked next to his naked granddaughter and that, after taking her home, her mother “pick[ed] up her bottom to put a diaper on her, and [could] see down into [her] anus.” Gore, 37 So.3d at 1180-81. At trial, the defendant's daughter testified that he had molested her in his bed when she was twelve years old, and both his daughter and his son (the victim's father) testified that the defendant had required them to be naked with him at home and at a nudist camp. Id. at 1183— 85. We found that the defendant’s "prior sexual abuse of his daughter tends to demonstrate ‘pedophilic sexual activities with young and developing female juveniles.... [The defendant’s] means of accomplishing these activities on past occasions bear substantial resemblance to each other and with the present offens[e]' " and that his demands that his children be naked involved sexual misconduct, because "his children swore that [the defendant] threatened and physically struck his daughter for failure to comply with his demand she be naked.” Id. at 1187. Accordingly, we found that the trial court had not abused its discretion by admitting the evidence.
In Green v. State, 89 So.3d 543 (Miss.2012), the defendant was on trial for sexually abusing his ten-year-old stepdaughter, based on her statement to school administrators that he had been "stickfing] his fingers in me every morning when he gets up[,] ... in my private parts” and her statement to a forensic interviewer that he "regularly put his finger inside her vagina 'in her bedroom when she would wake up in the morning....'” Green, 89 So.3d at 545-46. The trial court admitted testimony from the defendant's niece, half-sister, and two ex-stepdaughters that the defendant had sexually molested them when they were between the ages of seven and thirteen, including by digital penetration of their vaginas. Id. at 546-47. The two ex-stepdaughters testified that, late at night, after everyone else was asleep, the defendant had molested them in their bedrooms, and the niece testified that she had awakened to the defendant molesting her where she was sleeping on the couch. Id. The defendant’s half-sister, who was forty-nine years old at the *779 time of trial, testified that the defendant had sexually abused her when she was between the ages of nine (when the defendant was about fifteen years old) and thirteen. Id. at 547. We found that the testimony was admissible, because it "was offered to show that, over the course of five decades, [the defendant] engaged in the sexual abuse of female family members in a similar manner (the same or similar acts, in the same or similar locations), when they were near the age of puberty, i.e., vulnerable, ‘young and developing ... juveniles’ (the same or similar ages).” Id. at 549 (citing Gore, 37 So.3d at 1187).

. In fact, shortly before Vaughn was decided, the Court of Appeals determined explicitly that a nurse may testify that "injuries were consistent with [the victim’s] account that she had been sexually abused” so long as the testimony is not that the injuries "were, in fact, caused by sexual abuse.” Murray v. State, 20 So.3d 739, 742 (Miss.Ct.App.2009). Indeed, the Court of Appeals noted that "nursing professionals routinely testify as to whether a victim’s injuries are consistent with a sexual assault.” Murray, 20 So.3d at 742 (citing Havard v. State, 988 So.2d 322, 332 (¶ 29) (Miss.2008) (nurse testified that injuries *783 received by minor victim were the result of sexual trauma); Adams v. State, 772 So.2d 1010, 1017 (¶ 29) (Miss.2000) (nurse testified that the victim’s hymen was tom and that this injury was consistent with penetration by a penis, finger, or other object)).

. To be clear, then, in no way does this opinion overrule our holdings in Vaughn or Richardson, or in any other case.

. Several other states have recognized similar exceptions for the testimony of SANE nurses in sexual-assault cases. See Com. v. Jennings, 2008 PA Super 230, 958 A.2d 536, 541 (2008) (finding persuasive the holding that SANEs are qualified to testify as expert witnesses to the causation of injuries to victims of sexual crimes); Newbill v. State, 884 N.E.2d 383, 396-97 (Ind.App.2008) (allowing a SANE to apply her expertise to testify as to whether redness and irritation in the victim’s vaginal area was likely the result of forced sex); Rodriguez v. State, 281 Ga.App. 129, 635 S.E.2d 402 (2006) (holding a SANE was qualified to testify the child victim’s injuries were consistent with digital penetration); State v. Fuller, 166 N.C.App. 548, 603 S.E.2d 569 (2004) (finding that a SANE could testify regarding whether the child victim's injuries were consistent with someone who had been sexually assaulted).

.On the other hand, we choose not to go as far as our sister states in that we refuse to *784 find in today’s case that SANEs may testify as to causation in sexual-assault or abuse cases.

. IAFN: About Forensic Nursing — Sexual Assault Nurse Examiners (SANE), http://www. iafn.org/displaycommon.cfm?an= 1 & subarti-clenbr=546 (last visited October 22, 2012).

. Id.

. Id.

. Mississippi Coalition Against Sexual Assault — S.A.N.E. (Sexual Assault Nurse Examiner), http://www.mscasa.org/what-we-do/ sexual-assault-nurse-examiner/ (last visited October 22, 2012).

. Id.

. "What is a Sexual Assault Nurse Examiner (SANE)?” Available online at http://www. mscasa.org/images/user_files/files/SANE-brochure.pdf (last visited October 22, 2012).

. We briefly note the dissent's assertion that "the trial court erred by allowing Nurse Thomas to testify concerning undisclosed opinions.” The dissent states that we neglect to address this issue "perhaps because Young inartfully raised the issue.” In fact, this purported issue was not raised by Young on appeal.
At trial, Young made an objection to Thomas’s testimony about the abnormality of Cindy’s hymenal orifice size, as a discovery violation under Uniform Circuit and County Court Rule 9.04. However, in reviewing Young's briefs, we do not find any reference to the Rule 9.04 objection, to discovery violations, or even to Nurse Thomas testifying beyond her disclosed opinions.
The only language we find that might be stretched to constitute Young’s raising the Rule 9.04 issue is the following line: ”[i]t is from the trial court’s complete abandonment of [the ruling that Nurse Thomas must testify within her limitations] and the prosecution’s use of unqualified and surprise expert testimony that Mr. Young raises this assignment of error.” (Emphasis added.) The brief then goes on to discuss exclusively the argument addressed above, that Nurse Thomas improperly testified to causation. We would not strain the English language to find that this sentence constituted an appeal of Young’s Rule 9.04 objection at trial. Instead, we find the discovery objection to have been waived, and we do not address it sua sponte.