# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-KA-01062-SCT

*JESSE FRANK MOUTON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/01/2015 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| TRIAL COURT ATTORNEYS: | NATALIA VIAN PORSCHE |
| | MICHAEL W. CROSBY |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL W. CROSBY |
| | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: BENJAMIN ALLEN SUBER |
| |     GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/18/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1. Our trial judges have considerable discretion over discovery matters. This discretion extends to the handling of requests for continuances or mistrials based on alleged discovery violations. In this case, an expert witness testified that injuries to a child were consistent with sexual abuse. Her reports, photographs of the injured body area, and expert opinion

were previously disclosed to the defense. Yet, at trial, the defense took issue with the expert's testimony about the relevance of the shape of some of the injuries. After thoughtfully assessing the defendant's request to exclude the expert's testimony, the trial judge denied it. Though she found no discovery violation, the judge recessed trial for the day so defense counsel could further interview the expert. She also restricted the expert's testimony to external injuries but allowed the expert to give an opinion that the child's injuries resulted from sexual assault.

¶2.     On appeal, we find no abuse of discretion in the judge's handling of this issue, nor do we find she abused her discretion in denying a mistrial. Another alleged error involving the giving of a *Sharplin*[1] instruction lacks merit. And the defendant's claims of prosecutorial misconduct were either waived or unfounded.

¶3.     We affirm.

## Background Facts and Procedural History

¶4.     In 2012, Jesse Frank Mouton lived with his brother Jody and Jody's girlfriend Katelyn, at the Country Living Trailer Park in Woolmarket, Mississippi. Katelyn often babysat Toni Carpenter's children—three-year-old N.B. and two-year-old A.B. On June 17, 2012, Toni noticed that N.B. "act[ed] with discomfort" when she strapped him in his car seat.[2] Toni asked N.B. what was wrong. And he said "his butt was hurting." He told her Mouton "had been playing with his butt and wiener." When Toni confronted Mouton, N.B.

---

[1] *Sharplin v. State*, 330 So. 2d 591 (Miss. 1976).

[2] Mouton, Toni, N.B., and A.B. all spent the night of June 16, 2012, at Jody and Katelyn's trailer.

2

pointed to Mouton and again said Mouton had played "with his butt and wiener."

¶5. Ocean Springs Hospital performed a sexual-assault examination on the child.[3] And Susan Auge, a Sexual Assault Nurse Examiner, interviewed and examined N.B. Auge found four injuries to N.B.'s anus—a "rather large" abrasion and three anal tears. Auge concluded N.B.'s injuries were consistent with sexual abuse. She produced a ten-page forensic report, along with photographs taken during N.B.'s interview and examination.

¶6. On April 13, 2015, a Harrison County grand jury indicted Mouton on four counts of sexually assaulting N.B. Counts one and two charged Mouton with sexual battery.[4] Counts three and four charged him with touching a child for lustful purposes.[5]

¶7. Mouton was tried in May 2015. The State presented evidence and testimony from Toni, Auge, and a Biloxi police investigator, among other witnesses. Auge testified as an expert witness. She described one of the tears to N.B.'s anus as "V-shaped." In her opinion, the child's anal tears were consistent with sexual assault.

¶8. Mouton objected, claiming the State failed to disclose Auge's opinion on the significance of the "V-shaped" tear.[6] He argued this violated Mississippi Uniform Rule of

---

[3] Toni initially took N.B. to the Biloxi Regional Medical Center. That hospital could not perform the examination, so the Biloxi Police escorted Toni and N.B. to Ocean Springs Hospital.

[4] *See* Miss. Code Ann. § 97-3-95(1)(d) (Rev. 2014).

[5] *See* Miss. Code Ann. § 97-5-23(1) (Rev. 2014).

[6] During argument on the objection, the court examined and found that State's Exhibits 1, 3, and 4 were photographs, provided during discovery, that clearly showed N.B.'s anus and the "V shaped" tear. As the judge put it, "I've already ruled on the v. It's in the photographs, it's there."

3

Circuit and County Court Practice 9.04. But the trial judge disagreed. She found no discovery violation and held the State had met its discovery obligations. Thus, she denied Mouton's motion for a mistrial.

¶9. The judge did, however, grant a brief continuance and recessed court for the day to give Mouton an additional opportunity to question Auge about her expected testimony. When trial resumed the next day, the judge permitted Auge to testify. But the judge limited her testimony to only the external injuries she had observed while examining N.B.

¶10. The State also called Toni as a witness. Inconsistencies arose concerning her initial statement to police and trial testimony. She originally told police Mouton's ex-wife, Shannon McGrew, had informed her of other sexual-assault allegations involving Mouton and one of his children. But at trial, Toni claimed no knowledge of prior allegations against Mouton. She testified she made these statements to the police while she was "distraught and very flustered." Mouton called Shannon in response. She testified that the Mississippi Department of Human Services had cleared Mouton in the prior sexual-assault investigation. During cross-examination, the State asked Shannon if Mouton had visitation with their children and whether that visitation was supervised. Shannon answered affirmatively to both questions. Shannon was the defense's sole trial witness.

¶11. After nearly four hours of deliberation, the jury sent a note to the judge. The note explained the jurors were unable to reach a unanimous decision and needed guidance. After hearing from both sides, the judge decided to read a *Sharplin* instruction to the jury, instructing them to continue to deliberate. *See Sharplin*, 330 So. 2d at 596. Forty-one

4

minutes later the jury returned its verdict—finding Mouton guilty on one count of sexual battery and not guilty of the remaining three counts.

¶12.   Mouton filed a post-trial motion, seeking a new trial or judgment notwithstanding the verdict.  In it, he claimed three specific errors—(1) the State violated discovery rules by failing to disclose Auge's expert opinion on the shape of N.B.'s injuries; (2) the trial court gave an improper **Sharplin** instruction; and (3) the State committed prosecutorial misconduct during Toni's and Shannon's testimony.  The trial judge denied Mouton's motion.   On appeal, Mouton raises the same three claimed errors.

## Discussion

### I.      Discovery Violation

¶13.   From the beginning of trial, Mouton made a host of inconsistent discovery-violation claims.  But he only advances one on appeal—that the State introduced undisclosed expert testimony about the significance of the shape of N.B.'s anal tears.

¶14.   Mouton does not claim that Auge was not qualified to give an opinion that N.B.'s injuries were consistent with sexual abuse.  Nor does he claim the State failed to provide discovery and photographs depicting the child's anal tears.  Rather, what Mouton coins a discovery violation is that Auge did not write the words "V-shaped tear" in the disclosed materials.  So, as he sees it, Auge could not testify that one of the depicted tears to the child's anus was V-shaped, and that N.B.'s injuries were consistent with sexual abuse.  For this reason, Mouton insists, the judge erred by finding no discovery violation, improperly allowing Auge to continue testifying, and not granting his motion for a mistrial.

5

*A.    Standard of Review*

¶15.    The decision to admit or exclude evidence is left to the trial court's discretion. ***Wade v. State***, 583 So. 2d 965, 967 (Miss. 1991) (citations omitted).  And we review evidentiary decisions for abuse of discretion. ***Taylor v. State***, 954 So. 2d 944, 947 (Miss. 2007) (citations omitted).  This abuse-of-discretion standard also extends to alleged violations of Mississippi Uniform Rule of Circuit and County Court Practice 9.04 and to a trial court's denial of motions for continuance or mistrial. *See **Payton v. State***, 897 So. 2d 921, 942 (Miss. 2003) (decisions on Rule 9.04 and motions for continuance are within the trial court's discretion); *see also **Hurst v. State***, 195 So. 3d 736, 744 (Miss. 2016) (decisions on motions for mistrial are within the trial court's discretion).

¶16.    Under Rule 9.04(I), if the State attempts to introduce previously undisclosed evidence, the defense may object and be afforded an opportunity to examine the evidence or interview the witness.  URCCC 9.04(I).  If, after examination or interview, the defense claims unfair surprise or prejudice, the judge may either exclude the evidence or grant a continuance or mistrial. *Id*.

¶17.    Mouton's counsel admitted he had received Auge's ten-page forensic report—a report that specifically diagrams and pinpoints the three distinct tears to N.B.'s anus.  Defense counsel also acknowledged he had received photographs of the tears.  And he admitted receiving a letter from the State, disclosing that Auge would testify that the child's injuries were consistent with sexual assault.  Defense counsel also acknowledged he "interviewed [Auge] on at least one occasion" before trial.

¶18.   The record shows the trial judge carefully considered Mouton's argument, finding no merit to the bulk of it.  While she found no discovery violation, the judge still employed a "modified *Box* procedure" by granting Mouton a brief continuance.  *See Box v. State*, 437 So. 2d 19 (Miss. 1983).  The judge recessed court for the day and Mouton was allowed additional time to interview Auge.  And ultimately, Auge's testimony was limited.  Because Auge had not examined N.B. internally, the judge restricted her from testifying about internal injuries.  But, given the State's discovery and disclosures to Mouton, and the additional time to question the expert, Auge was allowed to continue her expert testimony.

¶19.   After review, we find no abuse of discretion in the judge's handling of the claimed discovery violation.  From the State's discovery—which Mouton admitted receiving—it was clear Auge would testify that the anal tears depicted in the photographs and forensic reports were consistent with sexual assault.  And the judge was thoughtful in her evidentiary analysis, crafting an approach that granted Mouton's request for additional time to question Auge, and ultimately limiting the expert's testimony to only external injuries.[7]  The judge did not abuse her discretion in denying a mistrial and allowing Auge to give her opinion about

---

[7] Even if Auge's use of the word "V-shaped" violated Rule 9.04, its mention was at most harmless.  We may not reverse based on a judge's handling of a claimed Rule 9.04 violation "unless it affirmatively appears from the record that the violation caused a miscarriage of justice."  *Ben v. State*, 95 So. 3d 1236, 1249 (Miss. 2012) (quoting *Payton*, 897 So. 2d at 942); *see also Hurst v. State*, 195 So. 3d 736, 744 (Miss. 2016) ("even in a total failure to adhere to Rule 9.04 by the trial court, that failure must still prejudice the party to constitute reversible error") (citations omitted).  Auge's disclosed opinion was and still remained that N.B.'s anal injuries were consistent with sexual assault.  And there was testimony from N.B.'s mother and the Biloxi police officer dispatched to investigate N.B.'s sexual assault, which corroborated N.B.'s statement that Mouton had "been playing with his butt and wiener."

the cause of the child's external injuries.

## II.    *Sharplin* **Instruction**

¶20.    Mouton next argues the trial judge's ***Sharplin*** instruction was improper and prejudicial.  Mouton claims that because the jury's note indicated the numerical split among jurors—"8 - 3 guilty"—the judge's ***Sharplin*** instruction was designed to influence the jury's decision.

¶21.    We have approved using a ***Sharplin*** instruction when a jury says it cannot reach a unanimous verdict.  *See **Powell v. State***, 58 So. 3d 55, 57-58 (Miss. 2011); *see also **Tyler v. State***, 19 So. 3d 663, 667-68 (Miss. 2009).  But given "the possibility of coercion," this Court takes note of a trial judge's "conduct and comments after he receives the [jury's] division[.]" ***Sharplin***, 330 So. 2d at 596.   It is reversible error for a trial judge to attempt  "to force a verdict by suggestive or coercive measures." ***Lafayette v. State***, 90 So. 3d 1215, 1219 (Miss. 2012) (quoting ***Isom v. State***, 481 So. 2d 820, 822 (Miss. 1985)).  The question we ask is "whether the judge merely afford[ed] the jury additional time to deliberate or [whether] he attempt[ed] to force a verdict . . . ." ***Sharplin***, 330 So. 2d at 596.

¶22.    Here, the judge's ***Sharplin*** instruction was essentially verbatim from our approved language, the one exception being the final sentence.[8]  This last sentence simply stated:

---

[8] The instruction approved by this Court states:

> I know that it is possible for honest men and women to have honest different opinions about the facts of a case, but, if it is possible to reconcile your differences of opinion and decide this case, then you should do so.
> Accordingly, I remind you that the court originally instructed you that the verdict of the jury must represent the considered judgment of each juror. It is your duty as jurors to consult with one another and to deliberate in view

"Please keep this jury instruction with the other jury instructions." We also notice Mouton did not acknowledge it was the jury that provided the numerical division. This was done without instruction or request from the trial judge. And the note did not indicate guilt or innocence as to the *specific* counts. *See **Sharplin***, 330 So. 2d at 596 (the mere request and receipt [by the trial court] of the jury's numerical division without reference to guilt or innocence does not coerce the jury and is not error). As such, there is no evidence of coercion or suggestion by the judge in giving the ***Sharplin*** instruction.

### III. Prosecutorial Misconduct

¶23. Mouton's final argument cites several moments at trial he now claims show prosecutorial misconduct. He points to his own witness's statements during the State's cross-examination, Toni's differing testimony from an earlier police statement, and the State's use of Auge's expert testimony. Mouton suggests these examples, both individually and together, warrant a new trial. We disagree.

¶24. This Court has been clear—"preservation of an issue for appeal requires a contemporaneous objection at trial." ***Roby v. State***, 183 So. 3d 857, 870-71 (Miss. 2016) (quoting ***Kirk v. State***, 160 So. 3d 685, 692 (Miss. 2015)). And Mouton's attempts to now

---

of reaching agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if you are convinced it is erroneous, but do not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. Please continue your deliberations.

*Sharplin*, 330 So. 2d at 596.

9

frame several unchallenged issues as "prosecutorial misconduct" does not relieve him from the requirement to contemporaneously object to preserve prosecutorial misconduct issues for appeal. *See Simmons v. State*, 805 So. 2d 452, 489-90 (Miss. 2001).

¶25. Mouton called Shannon, his ex-wife, to testify as a defense witness. During cross-examination, the State asked if Mouton had visitation rights with their three children and if his visitation was supervised. Shannon answered affirmatively to both questions. Mouton now suggests the State improperly implied his supervised visitation requirement related to the prior abuse allegations, when it knew the condition was required under Mouton's court bond.[9] This was probably an area of inquiry the State should have avoided. But Mouton did not object to the State's inquiry. Nor did he try to clarify the visitation issue on redirect. So this argument is waived.

¶26. Shifting to Toni's testimony, Mouton argues the State improperly "condon[ed] the change" in her testimony "without warning to the defense." He insists the State knew Toni's trial testimony—that she was unaware of prior abuse allegations—conflicted with her initial police statement. But the judge allowed the defense to exhaustively impeach her with her prior statement, which was admitted into evidence. And while Mouton claims he was barred from introducing rebuttal testimony, the witnesses he previously chose to disclose to the State were designated to testify only about Mouton's character. The trial judge noted this and

---

[9] Mouton claims this information was known only to the State and was discovered during an interview with Shannon that Mouton's counsel was not allowed to attend. This is unsupported. Furthermore, nothing in the record suggests Mouton could not have interviewed his own witness. Nor is it evident Mouton was unaware of the terms of his release on bond.

denied his request. Afterward, Mouton opted not to offer either character witness.

¶27. Again, Mouton's counsel made no objection based on prosecutorial misconduct, and we see no obvious prejudicial error on the State's part.

¶28. Since this Court has already addressed Mouton's claims about Auge's testimony, further discussion is unnecessary. To the extent Mouton claims cumulative error, we are not persuaded. "The cumulative error doctrine stems from the doctrine of harmless error, codified under Mississippi Rule of Civil Procedure 61." ***Ross v. State***, 954 So. 2d 968, 1018 (Miss. 2007). But "prejudicial rulings or events that do not even rise to the level of harmless error will not be aggregated to find reversible error." ***Id***. On review, the only issue that even potentially rises to the level of harmless error involves the judge's ruling on the State's supposed Rule 9.04 violation. And one potential harmless error does not amount to cumulative error. What is more, even if this Court were to conduct a cumulative-error analysis, we would examine "whether the issue of innocence or guilt is close," and because Mouton challenges neither the weight nor the sufficiency of the evidence, we do not find the issue close. ***Id***. So reversal is not proper.

## Conclusion

¶29. We find no abuse of discretion in the trial court's decisions involving the State's expert testimony. Nor do we find the trial court's ***Sharplin*** instruction improper or prejudicial. And because Mouton failed to timely object to alleged prosecutorial misconduct, those issues are not properly preserved for this Court's review. We therefore affirm Mouton's conviction.

**¶30. CONVICTION OF SEXUAL BATTERY-COUNT I AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. APPELLANT SHALL REGISTER AND RE-REGISTER AS A SEX OFFENDER. APPELLANT SHALL RECEIVE CREDIT FOR ANY AND ALL TIME SERVED AS TO THIS CHARGE.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., COLEMAN, BEAM AND CHAMBERLIN, JJ., CONCUR. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, J. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, J.**

**KITCHENS, JUSTICE, DISSENTING:**

¶31. I fully join the excellent analysis in Justice King's dissent and agree that Jesse Frank Mouton is entitled to a new trial because the trial court permitted the State's expert to provide opinion testimony which had not been disclosed to defense counsel as required by Rule 9.04 of the Uniform Rules of Circuit and County Court Practice.

¶32. I write only to observe that this Court has held, in civil cases, that "nurses cannot testify as to medical causation." *Vaughn v. Miss. Baptist Med. Ctr.*, 20 So. 3d 645, 652 (Miss. 2009). The Court continued that, "[s]ince medical diagnosis is outside a nurse's scope of practice, logically it would follow that a nurse should not be permitted to testify as to his/her diagnostic impressions or as to the cause of a particular infectious disease or illness." *Id.* "This is in keeping with the majority rule that nursing experts cannot opine as to medical causation and are unable to establish the necessary element of proximate cause." *Id.*

¶33. Conversely, this Court attempted to craft a distinction in order to permit sexual assault nurse examiners (SANEs) to testify that sexual assault injuries are consistent with trauma: "Thomas, a sexual-assault nurse examiner, did not testify as to what *caused* [the victim's] injuries; her testimony was only that those injuries were *consistent with* blunt, penetrating

12

trauma." ***Young v. State***, 106 So. 3d 775, 783 (Miss. 2012) (emphasis in original). There, the Court found that "the supervising physician, in this case Dr. Claudette Shepard, made a final determination as to ultimate causation, medical diagnosis, and treatment." ***Id.*** at 781. Seemingly to the contrary, the Court then reasoned that to *require* physician supervision would be too restrictive: "[t]o restrict SANEs from testifying as to sexual assault would set a dangerous precedent, forcing supervising physicians to devote more of their valuable time to trial work, and making it more difficult for rape victims to achieve justice, while failing to provide any useful protections to sexual-assault defendants." ***Id.*** at 784.

¶34.    I concurred in part and dissented in part in ***Young***, quoting my ***Vaughn*** dissent in support of the majority's holding that the trial court had not erred by allowing the sexual assault nurse examiner's testimony:

> [T]he issue of whether a particular nurse, by virtue of his or her knowledge, skill, experience, training or education, possesses such ability is better determined by a case-by-case inquiry than by a broad, "one-size-fits-all" judicial pontification to the effect that no nurse in the world will ever be allowed to testify as to medical causation in any Mississippi court case. As is true of any other profession, the education, experience and understanding of nurses span a broad spectrum. We should not enunciate a hard and fast rule that permanently forecloses the possibility of any nurse's being qualified to give expert testimony on medical causation in any and all cases that may arise in the future.

***Young***, 106 So. 3d at 790 (Kitchens, J., concurring in part and dissenting in part) (quoting ***Vaughn***, 20 So. 3d at 657 (Kitchens, J., dissenting)).

¶35.    In the present case, Nurse Auge opined, as an expert, that the shape and location of the victim's injuries indicated that those injuries *were caused*, not by a hard stool exiting the anus, but rather by something entering the anus: "[t]he tears are indicative of something large

13

penetrating the anal sphincter."

¶36.    I maintain that qualified nurses—irrespective of whether they are qualified in civil or criminal cases—should be allowed to testify to causation. If this Court forbids a qualified nurse to testify to causation in a civil case in which mere money is at stake, why should a sexual assault nurse examiner be permitted to testify to causation in a criminal case in which the defendant's liberty is at stake and in which the State is obligated to prove each element of the crime beyond a reasonable doubt? The only apparent explanations for such arbitrary, contradictory rules are, first, the interest of civil defendants in preventing potentially harmful causation testimony from an otherwise-qualified nurse and, second, the expediency to the State of utilizing the testimony of a qualified sexual assault nurse examiner in obtaining a conviction. Such interest-driven distinction is not legitimate and renders the notion that the Mississippi Rules of Evidence are applied the same in civil and criminal trial a mere myth.

**KING, J., JOINS THIS OPINION.**

**KING, JUSTICE, DISSENTING:**

¶37.    Because I believe that the State essentially conducted a trial by ambush by failing to disclose Auge's testimony about the shape and location of the tears, I respectfully dissent with the majority's finding on that issue.

¶38.    Pursuant to Uniform Rule of Circuit and County Court Practice 9.04, "[t]he prosecution must disclose to each defendant or to defendant's attorney . . . any reports, statements, or opinions of experts, written, recorded or otherwise preserved, made in connection with the particular case and the substance of any oral statement made by any such

expert . . . ." URCCC 9.04(A)(4).[10] The purpose of Rule 9.04 is to "avoid unfair surprise to either the state or defendant at trial." ***Ramos v. State***, 710 So. 2d 380, 386 (Miss. 1998). "[W]e have held that the duty to make discovery extends to unwritten statements and reports as well." ***West v. State***, 553 So. 2d 8, 17 (Miss. 1989). Therefore, pursuant to Rule 9.04, the prosecution *must disclose* any expert opinions and the substance of the opinion of any oral statement made by any such expert. I believe that the prosecution's failure to disclose that its expert would testify about the v-shape of the tear, that the tear was an anterior tear, and that the tear had been partially internal was highly prejudicial to the defense.

¶39.　First, the prosecution provided to the defense a statement that Auge's testimony would include that the injuries sustained were consistent with the history presented. That statement was vague and gave no indication that Auge would testify as to the V-shape of one of the tears or of its implications. Auge's ten-page medical report also did not contain any references concerning the shape of the anal tears or references to internal injuries or the implications thereof. Had the defense been informed of Auge's opinions prior to trial, it would have had the opportunity to prepare an effective cross-examination and to present its own evidence in rebuttal.[11]

---

[10]Rule 9.04 formerly was Uniform Rule of Criminal Court Practice Rule 4.06.

[11]The majority asserts that the trial court had examined and found that the State's exhibits had clearly shown "N.B.'s anus and the 'V-shaped' tear." The majority misstates the trial court. During argument on the objection, the trial court asked Auge which photographs depicted the v-shaped tears. The trial court said, "With that then clearly depicted in the photographs so she can clearly testified it wasn't in the opinion what the shape of it was. . . ." The trial court went on to say, "I've already ruled on the v. It's in the photographs, it's there. You can call it whatever shape you want to. She can call it whatever shape she wants to. That's a matter that the jury will decide if a V, a W, an X, whatever it

15

¶40. The prosecution's failure to disclose Auge's testimony and its allowing Auge to testify repeatedly on the undisclosed opinions caused a miscarriage of justice. Auge testified extensively about the shape and position of the tears:

- I noted four specific injuries. One was a tear at 12 o'clock, again that was v-shaped . . .

- The tears, the anal tears, there is – the major reason for an anal tear is actually a large hard stool that is passed . . . . Usually those – 99 percent of those tears are posterior. They go toward the back side. So on the anus it would go toward the backside. Ninety-nine percent of all cases are of anal tears due to constipation is a posterior tear. You can have an anterior tear as well, but again 99 percent are posterior.

- [Posterior tears are] [b]ehind in the backside of the anus. That piece of tissue receives less vascular circulation. So that part is the one that generally tears as posterior.

- He had three anal tears. One was at 12 o'clock again based on the clock. That was a v-shape tear.

- The v-shape tear was wide toward the outer aspect of the anus and went in toward the inner aspect of the anus with traction and dilatation, which is just the slightness of the anus. I was unable to see the end of the tear. So it went inside where the anus was dilated.

- As you can see this – if you're not upclose and looking at it it's difficult to see. But up here is the v-shape tear. It starts here and it goes here, and it goes into the anal vault.

- The v-shape tear is at 12 o'clock . . . . There is a large tear to the posterior area, which again for certain aspects you would expect that. An anterior tear is not necessarily something that I would expect.

_____

might look like to them." The trial court did not state that the photographs clearly depicted a V-shape, only that the photographs depicted a tear and it was up to the jury to decide whether it looked like a V-shape to them. In addition, whether the photographs depict a V-shape is a secondary issue. The primary issue is that Auge was directly asked to disclose all opinions before trial. Auge clearly failed to disclose, or to even mention, any opinions at all on the shape of the tear and the implications thereof.

- This right here with the blue dye it allows us to see injuries a lot clearer. And if you look right here this area here, it starts here and it is a v-shape tear that goes toward the rectum. Again even with dilatation I was unable to see the very end of that tear.

- Like – I don't know – previously I've stated that just having a large bowel movement with a rectal tear generally in the posterior area adults come into the emergency room with that pain.

- Individually, individually each tear certainly could be caused, other than the v-shape tear, by a large stool coming out. Collectively, no, sir.

- Again the v-shape tear is just significant of an outside force going in toward the anus. So there would have to be a rational reason, and again that would come from your history as to why that particular tear was there.

- [Let me ask you. You're saying that you got the outside – that you think that the v-shape indicates an outside force, right?] Absolutely.

¶41. Auge was the only expert witness called at trial and her testimony arguably was the most convincing evidence that the prosecution produced. Thus, her opinion that one of the tears was in a V-shape and that this particular shape indicated that there had been an outside force going into the anus, was extremely prejudicial to the defense. Out of the four counts with which Mouton had been charged, the jury convicted only on Count I - Sexual Battery: sexual penetration by inserting his finger into the anus of N.B. Auge's testimony that the V-shaped tear indicated that something was going into the anus instead of a large stool going out of the anus directly was correlated with Count I. This, coupled with the jury's initial deadlock in convicting Mouton, indicates that Auge's testimony on the V-shaped tear and the posterior/anterior location of the tear was extremely prejudicial to the defense and important to the jury. As this Court has emphasized, "[j]ustice is better served when the

17

accused knows 'reasonably well in advance of trial what the prosecution will try to prove and how it will attempt to make its proof. . . .'" **Densmore v. State**, 27 So. 3d 379, 382 (Miss. 2009). Accordingly, I believe that the prosecution's failure to notify the accused in advance of trial of the opinions of its expert was reversible error.

¶42. The clear language of Rule 9.04 states that *any* expert opinions must be disclosed. Mere disclosure of the location of anal tears does not fulfill the rule's requirement to disclose *any* expert opinions. In a trial in which the defendant is accused of sexual battery, a blanket disclosure that Auge would testify that the injuries were consistent with sexual abuse does not suffice. That in no way put Mouton on notice of Auge's opinions about the shape of the anal tears or of her opinion that the particular shape indicated the tear was caused by an outside force. Mouton had prepared a defense that the tears had been caused by constipation. Had Auge's opinion that the specific "V-shape" of the tear indicated it was caused by an outside force been disclosed, Mouton would have had an opportunity to amend his defense.

¶43. N.B.'s mother potentially had known of similar accusations against Mouton that, after an investigation, were found to be without evidence and were dropped. In her own statement to the police, she asserted that, "[a]fter I picked up my son [N.B.] and daughter [A.B.], [N.B.] start [sic] to complain about his butt. I asked him has anyone messed with him in his areas . . . ." N.B. was three years old at that time and Auge admitted that a child that young could hear someone ask questions about a situation and the child would think that it had happened to him even though it did not. At the time of trial, N.B. could not remember most of what, if anything, had happened that night. Thus, the opinion that N.B.'s anal tears could have been

18

caused by constipation were it not for the V-shape became vitally important.

¶44. Moreover, Mouton's attorney stated that he had interviewed Auge at great length and that he had asked her to "tell [him] everything that she found and why and the possibilities associated therewith." Auge did not disclose her opinions about the shape of any of the tears, that the tears were anterior as opposed to posterior, or of her opinions on what she believed the shape and location of the tears indicated. Therefore, despite Mouton's attorney having inquired, Auge either withheld or changed her opinions as to the shape, location, and meaning of the tears. In either scenario, Mouton lacked notice of Auge's opinions at trial. Hence, I believe a new trial giving Mouton an opportunity to prepare an effective defense is the appropriate remedy for the discovery violation.

¶45. I submit that the prosecution's failure to disclose Auge's opinions violated Rule 9.04, unfairly surprised the defense, and constituted a miscarriage of justice. Accordingly, I dissent and would reverse the judgment and remand for a new trial.

**KITCHENS, J., JOINS THIS OPINION.**