# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00131-COA

DONALD TURNER A/K/A DARNELL TURNER       APPELLANT
A/K/A SLICK

v.

STATE OF MISSISSIPPI       APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 09/22/2017 |
| TRIAL JUDGE: | HON. JEFF WEILL SR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | DENNIS C. SWEET III DENNIS C. SWEET IV TERRIS CATON HARRIS DONALD TURNER (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 03/17/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., GREENLEE AND LAWRENCE, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1. In the late night and early morning of July 12-13, 2014, Donald "Darnell" Turner and Kimberly Anderson, with whom he shares a child, had an altercation after Turner left a nightclub with his girlfriend, Elizabeth Stevenson, and Anderson followed Turner and Stevenson in a separate vehicle to a restaurant. Following an indictment and jury trial, Turner was convicted in the Hinds County Circuit Court of aggravated assault with a

weapon, aggravated domestic assault, and shooting into Anderson's vehicle. On appeal, Turner presents numerous (nine) alleged errors. Finding reversible error on issues I, II, and III, as set out in the discussion section below, we reverse and remand the case for a new trial.

## FACTS AND PROCEDURAL HISTORY

### I. Background

¶2. The testimony and evidence at trial showed that Turner met Anderson in late 2011 or early 2012. It also reflected that Turner met Stevenson in 2012. According to Anderson, her relationship with Turner was "casual," but she became pregnant with Turner's child one year after they met. According to Stevenson, she had been dating Turner since they met in 2012. Stevenson and Turner were dating at the time of the trial.

¶3. On Thursday, July 12, 2014, Turner and Stevenson went to dinner and then to a local nightclub called "Freelon's" in downtown Jackson. Anderson, on her own accord, also went to Freelon's that night. The record showed that both parties frequented Freelon's. After spending three hours there, Turner and Stevenson left to get late-night food at the Dairy Bar restaurant.

¶4. Anderson, who saw Turner leaving Freelon's, also left the club to follow Turner in her vehicle. When Turner noticed that Anderson was trailing his vehicle, he sent a text message to Anderson telling her, "Go home." Anderson responded, "Okay," to the text message, but she continued to follow Turner's vehicle. The events that transpired after the parties arrived at the Dairy Bar were disputed at trial and subject to conflicting eyewitness

2

testimony. We will discuss them below.

## II. Charges

¶5. In April 2016, Turner was indicted for one count of aggravated assault (Count I), one count of aggravated domestic violence (Count II), and one count of shooting into an occupied vehicle (Count III). Count I alleged that Turner "willfully, unlawfully and feloniously attempt[ed] to cause serious bodily injury to Kimberly Anderson with a deadly weapon, to wit: a pistol, by firing the pistol in her direction." Count II alleged that Turner "unlawfully, knowingly, feloniously and intentionally strangle[d] or attempt[ed] to strangle Kimberly Anderson, a human being, who has a former dating relationship with the defendant or at a time when Kimberly Anderson had a biological child with the defendant." Count III alleged that Turner "unlawfully, knowingly, feloniously and intentionally sh[o]t a firearm at or into a motor vehicle occupied by Kimberly Anderson." Five-year firearm enhancements were also extended to Counts I and III.

## III. Trial

¶6. The case was tried before a Hinds County Circuit Court jury on September 5-6, 2017. At trial, the State presented five witnesses. The defense presented one witness. Turner did not testify in his own defense. The State's first witness was Officer Chris Gallion of the Jackson Police Department.

### A. The State's Case-in-Chief

¶7. In the evening of July 13, 2014, Officer Gallion responded to a call directing him to

3

Central Mississippi Medical Center (CMMC) in reference to an alleged assault that occurred the previous night. At the hospital, Officer Gallion spoke with Anderson, the victim. There, Anderson named her former companion, Turner, as the assailant who allegedly assaulted her near the Dairy Bar parking lot and had fired a handgun at her vehicle. Officer Gallion testified that he noticed Anderson's bodily injuries, including a swollen and "bloodshot" left eye and bruising to her right shoulder and hip. Before leaving the hospital, Officer Gallion took Anderson's statement and completed an incident report. In his report, Officer Gallion accused Turner of "domestic violence, aggravated assault." Officer Gallion then turned the case over to Detective Kevin McNeal, the State's second witness.

¶8.    Detective McNeal interviewed Anderson five days later on July 18, 2014. He testified that he saw Anderson in "physical turmoil" with "bruises and scars and scratches" on her body. During the interview, Detective McNeal presented Anderson with a six-man photo lineup so that she could pick out her attacker. Anderson circled Turner's picture and wrote on the bottom of the photo lineup, "He jumped on me[,] shot at my car[,] held me over the bridge on Hill and Valley Street[,] choked me and drove me home[,] and was hitting me in my face while driving." After the interview, a bench warrant was issued for Turner's arrest. Turner was brought into custody on August 12, 2014.

¶9.    The State's third witness was Anderson. The bulk of Anderson's testimony concerned her account of the events on the night in question. Anderson testified that she saw Turner at Freelon's on July 12, 2014. According to Anderson, Turner "motioned" for her to leave

4

Freelon's at the same time he was leaving the nightclub. Anderson left the nightclub and proceeded to follow Turner in her own vehicle. She followed Turner for some time before she received the text message from Turner instructing her to "Go home." Anderson testified that she replied, "Okay," to Turner's text message but disregarded the text message and continued to trail his vehicle. When questioned on direct examination why she continued to follow Turner, Anderson explained that "[she] wanted to know what was . . . different about [that night]."

¶10.    Eventually, Turner pulled into the parking lot of the Dairy Bar restaurant followed by Anderson. According to Anderson, Turner parked his truck, exited his vehicle, and started walking toward her vehicle. Anderson testified that Turner opened her vehicle door and started hitting her with his fists, telling her to "go home." At some point, Anderson managed to get away from Turner's grasp, but she stated that she could not leave the parking lot because Turner's vehicle was blocking the exit.

¶11.    Anderson thereafter heard a female voice coming from the passenger window of Turner's vehicle say, "You must be Emma's mom."[1] Anderson stated that this was the first time that she noticed Stevenson was with Turner. Anderson testified that Turner fired a gun pointed toward her vehicle and that Turner grabbed her again. According to Anderson, Turner progressed to verbally threaten and choke her while holding her body over a nearby

---

[1] A fictitious name is used to protect the name of the minor. Turner is Emma's biological father.

ditch. When Turner let go, Anderson fell to the ground. Turner and Stevenson then drove off.

¶12. A man[2] then approached Anderson and asked if she needed help. She asked the man to retrieve her cellphone from her vehicle. The man walked to her car, but Turner returned and asked the man what he was doing. Anderson claimed that the man tried to explain to Turner that he was getting Anderson's cellphone, but then Turner, without explanation, starting hitting the man.

¶13. After the second assault, Anderson testified that Turner put her in the back of her vehicle and ordered Stevenson to follow them in his vehicle. During the drive, Turner allegedly continued to hit Anderson. When asked about a particular scratch on her chin, Anderson claimed that Turner had hit her "with the butt of [his] gun." Turner and Anderson arrived outside Anderson's family home in the early morning hours of July 13, 2014. Anderson testified that Turner dropped her off outside her home and left her in her vehicle.

¶14. After Turner left, a neighbor who was passing by Anderson's home saw Anderson's vehicle door ajar and asked if she was okay. Anderson told her neighbor to "[g]o ring the doorbell" to get her father, and he did. Anderson's father, Sherman Anderson, appeared at the door and took Anderson inside.

¶15. Sherman was the State's fourth witness. He testified that he saw his neighbor and his daughter standing at the front door. His neighbor exclaimed that Turner had "beat"

---

[2] The man's name was Anthony Steele.

Anderson. Inside their home, Anderson explained to her father and mother that she was sore and upset because of Turner's actions. Sherman then attempted to reach Turner by phone, but Turner did not answer. Later that night, Anderson's mother drove Anderson to the hospital, where she was treated for her injuries. When Anderson and her mother returned home from the hospital, Sherman testified that Anderson reiterated Turner had beaten her up and choked her.

¶16. Finally, the State called Nurse Shalotta Sharp, who was presented as the State's expert witness and admitted as an expert in the field of domestic violence. She testified about Anderson's medical records and whether the records were consistent with domestic violence and strangulation. After Nurse Sharp's testimony, the State rested.

¶17. Before defense counsel called its first witness, Turner moved for a directed verdict. Turner also moved for a mistrial based on a comment made by the State claiming that Turner had confessed to the crime via text message to Anderson. The court denied both motions.

### B. The Defense's Case-in-Chief

¶18. In his case-in-chief, Turner called Stevenson as his sole witness, and he did not testify in his own defense. According to Stevenson, she and Turner went to dinner and then to Freelon's on the night of July 12, 2014. After three hours, she and Turner left Freelon's to get something to eat at the Dairy Bar. Stevenson testified that she noticed a car following them, so she mentioned it to Turner. When they arrived at the Dairy Bar, Turner parked his vehicle, and the other vehicle parked behind them. Stevenson then explained that Turner got

7

out of his vehicle to see who was following them. Turner returned moments later and told Stevenson, "That was Kim." Shortly after that, Stevenson testified that Anderson got into the back of Turner's vehicle and started yelling and screaming at Turner, "You a liar. You a liar. Why you lying to me? . . . Why you with her?" Stevenson stated that Anderson was "very upset" and that she swung her fists at Turner. Stevenson testified that Turner tried to restrain Anderson and continued to tell Anderson to "go home." Anderson eventually exited his vehicle, and Stevenson and Turner tried to drive off. Stevenson testified that before they left the parking lot, Anderson jumped onto the passenger side of Turner's vehicle "like a superhero." Stevenson then explained that because Turner's vehicle was moving, Anderson's body was "jolted" onto the ground. Stevenson stated Turner stopped his vehicle and checked on Anderson. As he approached, Stevenson stated that Anderson started hitting Turner again. Stevenson denied seeing Turner fire a weapon at Anderson's vehicle.

¶19.   Stevenson and Turner left the parking lot but returned a few minutes later to see if Anderson had left because they were in a "bad part of town." Stevenson testified that Anderson had not left, so Turner got out of his vehicle and went back to Anderson in an attempt to convince her to go home. When Turner returned, Turner told Stevenson that Anderson would not go home unless he drove her home. Stevenson acquiesced and followed Anderson and Turner in his vehicle. When they arrived at Anderson's family home, Turner parked Anderson's vehicle and jogged to his truck. Stevenson then explained that Anderson got out of her vehicle and starting running toward Turner's truck. Before Anderson could

8

reach them, Stevenson and Turner successfully pulled away. At the conclusion of Stevenson's testimony, Turner rested his case.

¶20. After Turner rested, Turner proffered testimony from individuals named Terrance Patton and Cloe Hall to elicit evidence of Anderson's prior bad acts. Both witnesses proffered testimony about specific events concerning Anderson. At the end of trial, the jury found Turner guilty of one count of aggravated assault, one count of aggravated domestic violence, and one count of shooting into an occupied vehicle. The jury also imposed two five-year firearm enhancements to Counts I and III. As a result, the circuit court sentenced Turner to serve the following consecutive sentences in the custody of the Mississippi Department of Corrections: ten years for Count I, with five additional years for the firearm enhancement; twenty years for Count II; and five years for Count III, with five additional years for the firearm enhancement. Turner then filed a motion for judgment notwithstanding the verdict or a new trial. Both motions were denied. He later filed a notice of appeal.

## DISCUSSION

### I. Nurse Sharp's Expert Testimony

¶21. Turner asserts that Nurse Sharp, the State's expert witness and a "Sexual Assault Nurse Examiner" (SANE), was not qualified to testify as an expert in domestic violence and strangulation. Turner also argues that Nurse Sharp's testimony was unreliable and speculative, specifically regarding Anderson's left eye, a hypodensity area in her brain, and a vertebrae defect. Because her testimony was allegedly unqualified, unreliable, and

9

speculative, Turner asserts that Nurse Sharp's testimony "substantially prejudiced" his trial. We disagree that Nurse Sharp was not qualified to testify in the area of domestic violence, but we agree that portions of her testimony were speculative and unreliable.

¶22.    In opposition, the State claims that Nurse Sharp's testimony was relevant "because it assisted the trier of fact in determining whether Anderson had been strangled . . . ." The State also contends that Nurse Sharp's testimony was reliable "because it was based on [her] specialized training as a nurse, and . . . scientific knowledge." According to the State, "all of Turner's arguments [went] to the weight of Sharp's testimony, not its admissibility."

¶23.    We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion. *Vaughn v. Miss. Baptist Med. Ctr.*, 20 So. 3d 645, 654 (Miss. 2009) (citing *Webb v. Braswell*, 930 So. 2d 387, 396-97 (¶15) (Miss. 2006)); *Triplett v. River Region Med. Corp.*, 50 So. 3d 1032, 1039 (¶30) (Miss. Ct. App. 2010).  A trial court's decision to allow expert testimony will be affirmed "[u]nless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice a party in a civil case[] or the accused in a criminal case." *Jones v. State*, 918 So. 2d 1220, 1223 (¶9) (Miss. 2005).

¶24.    Mississippi Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles

10

and methods reliably to the facts of the case.

Therefore, while an expert may be qualified to give an opinion in a particular area of expertise, the testimony must still be "based upon sufficient facts or data"; the testimony must still be "the product of reliable principles and methods"; and the expert must still have "applied the principles and methods reliably to the facts of the particular case." M.R.E. 702. Mississippi courts have held that an expert's qualification and the reliability of testimony are separate questions. *See, e.g.*, *Bullock v. Lott*, 964 So. 2d 1119, 1129 (¶30) (Miss. 2007). In addition to this rule, Mississippi has adopted the *Daubert* standard for the admission of expert testimony. *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 35 (¶5) (Miss. 2003) (citing *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 113 (1993)). The factors in that analysis include:

> [(1)] whether the theory or technique can be and has been tested;
>
> [(2)] whether it has been subjected to peer review and publication;
>
> [(3)] whether, in respect to a particular technique, there is a high known or potential rate of error;
>
> [(4)] whether there are standards controlling the technique's operation; and
>
> [(5)] whether the theory or technique enjoys general acceptance within a relevant scientific community.

*McLemore*, 863 So. 2d at 37 (¶13). We first turn to whether Nurse Sharp was qualified to testify in the area of domestic violence and then transition to whether that testimony was reliable.

11

¶25.    The circuit court acted well within its discretion by accepting Nurse Sharp as an expert in domestic violence. The record reveals that Nurse Sharp had been practicing nursing for twenty-one years and that she received her degree in nursing from the University of West Alabama. The record also shows that Nurse Sharp was a certified SANE at the time of trial. In order to achieve that certification, Nurse Sharp had to undergo hours of extensive training and complete required objectives specifically related to sexual assault. In doing so, Nurse Sharp attended SANE-specific courses, starting in 2002. Nurse Sharp continued to attend other SANE courses, including one course that dealt with pediatric patients. In addition to those courses, Nurse Sharp frequented numerous conferences and other educational offerings regarding interpersonal violence. Additionally, Nurse Sharp taught classes on forensic nursing and had previously been accepted as an expert by courts in this state in both interpersonal violence and sexual assault. Therefore, we agree Nurse Sharp met the *Daubert* qualifications to testify as an expert in the area of domestic violence.

¶26.    Portions of Nurse Sharp's testimony, however, were not based on sufficient facts or data. For expert testimony to be reliable, "an expert's testimony must be based on methods and procedures of science, and not merely on subjective beliefs or unsupported speculation." *Ross v. State*, 954 So. 2d 968, 996 (¶57) (Miss. 2007). Further, expert opinions "must rise above mere speculation" to be admissible. *Parvin v. State*, 113 So. 3d 1243, 1247 (¶14) (Miss. 2013) (quoting *Williams v. State*, 35 So. 3d 480, 486 (¶19) (Miss. 2010)). Here, we address a situation involving an expert who drew conclusions based on facts not in evidence.

¶27.    In its brief before this Court, the State relies on *Young v. State*, 106 So. 3d 775 (Miss. 2012), to argue that Nurse Sharp reliably testified to Anderson's strangulation. In that case, the victim suffered from repeated sexual encounters with her father. *Id.* at 776 (¶2). At trial, a SANE was accepted as an expert witness by the trial court to offer expert opinions regarding the injuries she observed while examining the sexually assaulted victim, as long as the expert's testimony remained "within the limitations of a sexual assault nurse." *Id.* at 777 (¶5). The SANE expert witness testified to certain sexual-assault indicators, such as estrogenization levels, the absence of the hymen, testimony about hymen size and sexual activity, and the cause of the tear or rupture and attenuation of the hymen; and the expert then related those indicators back to the victim's anatomy. *Id.* at (¶6). At the end of the expert's testimony, the trial court permitted the expert to testify that the victim's injuries were "*consistent with* blunt penetrating trauma of the vaginal area and the anal area." *Id.* at 780 (¶19) (emphasis added).

¶28.    A jury's guilty verdict was entered, and Young appealed to this Court. *Id.* at 777 (¶7). We affirmed. *Id.* The Mississippi Supreme Court subsequently granted a petition for writ of certiorari to consider, among other things, whether the SANE expert witness was qualified to testify to the injuries she observed. *Id.* at 780 (¶19). In that opinion, the supreme court held that given the expert witness's extensive experience in sexual-assault examination and other related exposures, the expert witness's was qualified to testify that certain evidence was consistent with sexual assault. *Id.* at 784 (¶31). The supreme court rationalized:

13

> [t]o restrict SANEs from testifying as to sexual assault would set a dangerous precedent, forcing supervising physicians to devote more of their valuable time to trial work, and making it more difficult for rape victims to achieve justice, while failing to provide any useful protections to sexual-assault defendants.

*Id.*

¶29. Here, the State adopts an argument derived from *Young*. In particular, the State claims that since Nurse Sharp testified that Anderson's injuries were "*consistent with* [Anderson's] history of being assaulted and being strangled," the words "consistent with" changed her testimony from causation testimony and was therefore reliable. We disagree for two key reasons.

¶30. First, the instant case does not involve a sexual assault. The victim's injuries were caused by an alleged domestic dispute. The record demonstrates that Turner was neither indicted nor tried on a sexual-assault charge, and we find no evidence within the record that indicates to us that Turner's alleged crime was sexually motivated.

¶31. Second, Anderson's medical records did not align with Nurse Sharp's testimony. In particular, we focus on three areas identified by Turner: (A) Anderson's left eye, (B) Anderson's hypodensity area and vertebrae defect, and (C) the abrasion under her chin.

### A. Anderson's Left Eye

¶32. Turner argues it was improper for Nurse Sharp to testify that the redness of Anderson's eye was consistent with being strangled. Specifically, she testified as follows:

[State]: . . . What do we call this right here, this red area (indicating)?

[Sharp]: That's also [a] subconjunctival hemorrhage in that part of the eye.

. . . .

[State]:          Now, let me stop you right there.  How does [strangulation] lead to a subconjunctival hemorrhage?

. . . .

[Sharp]:          . . . Because of all of these factors, the pressure to the carotid arteries that can cause the interruption of blood supply to the brain, the pressure of the jugular veins, which doesn't let the blood back towards the heart and lungs, that pressure can cause a buildup in that smallest blood vessel known as capillaries. And that pressure buildup can cause a rupture.

                        Because of the deoxy—the oxygenated blood not making it to the brain, several things can happen.  It can cause a person to pass out, which was indicated in her medical history, because the brain can't get the oxygen to stay awake and keep the body functioning properly.  It can also, because of this pressure to the trachea, cause a person to experience the nausea and vomiting or gagging.  There could be swelling to the soft tissue that can cause that as well.

The record shows that Anderson endured a subconjunctival hemorrhage in her left eye.  Yet we find it speculative and unreliable that Nurse Sharp provided testimony that Anderson's subconjunctival hemorrhage was "consistent with" strangulation.  In Anderson's nursing chart, Anderson's attending nurse wrote, "[Anderson] states she was hit all over and complains of pain all over."  Further, Anderson's primary physician's impression of Anderson's injury was "assault," not strangulation.  After reviewing the medical records relevant to the subconjunctival hemorrhage, we find that there is no evidence supporting the opinion that strangulation manifested a subconjunctival hemorrhage in Anderson's left eye. Thus, we fail to see how Nurse Sharp could reliably opine that this injury was "consistent

15

with strangulation" without speculating. *See Fowler v. State*, 566 So. 2d 1194, 1199 (Miss. 1990) ("Expert witnesses, however[] qualified, may not present the jury with rank speculation.").

### B. Hypodensity Area and Vertebrae Defect

¶33. Turner also claims that Nurse Sharp unreliably testified to Anderson's hypodensity area in her brain and a vertebrae defect. We note that the circuit court sustained an objection to testimony regarding the vertebrae defect but overruled an objection to testimony regarding the hypodensity area in Anderson's brain. Nurse Sharp testified:

> [State]: Now, you also mentioned a hypodensity area of the left basal ganglia. Is it – how could that be consistent with strangulation as well?
>
> [Sharp]: Because of the interruption in the blood supply to the brain, it can cause defects to . . . the brain.
>
> [State]: All right. And would that hypo[density] area of the left basal ganglia be a defect?
>
> [Sharp]: It is considered a defect, and it was noted in the radiology report as abnormal finding.

The record shows that Anderson's "Radiology Results" listed a 7-millimeter area of non-specific hypodensity in the left basil ganglia of "indeterminate age." There is no conclusive evidence attributing the hypodensity area to strangulation. Without a valid scientific connection to the hypodensity area in Anderson's brain, the inquiry is inadmissable. *See McLemore*, 863 So. 2d at 36 (¶11). Therefore, we find that Anderson's medical records refute a finding that the area of hypodensity was "consistent with strangulation."

16

### C. Chin Abrasion

¶34. Finally, Nurse Sharp testified:

> [State]: . . . And in your report, did you see any way that the abrasion that's in Exhibit 6c, the abrasion to her chin area there, how could that have been consistent with strangulation?
>
> . . . .
>
> [Sharp]: Okay. The abrasion consistent with strangulation, it could have been from the victim or the patient trying to remove the hands of an individual that was inflicting the strangulation. It could have been placed there by the person that was inflicting the strangulation.

But Anderson's testimony and corresponding medical records contradict this testimony. Prior to Nurse Sharp's testimony, Anderson testified that "[Turner] hit me with the butt of the gun, because he had the gun still in his hand when he got me out of the car." Anderson's medical records also fail to identify or discuss the abrasion to Anderson's chin. Thus, it was speculative for Nurse Sharp to testify that Anderson's chin abrasion was consistent with strangulation.

¶35. In conclusion, we hold that the circuit court abused its discretion by allowing Nurse Sharp to testify to the aforementioned statements regarding Anderson's injuries because these statements were speculative and unsupported by Anderson's medical records. For these reasons, we find that such testimony substantially prejudiced Turner's trial in violation of Mississippi Rule of Evidence 403. This error, among others, requires that this case be reversed and remanded for further proceedings consistent herewith.

### II. Exclusion of Turner's Expert Witness

¶36.    Prior to trial, on August 14, 2017, the State moved for a *Daubert* hearing to determine whether Turner's initial expert, Dr. Timothy Summers, was qualified to testify.  The record reflects that Dr. Summers voluntarily withdrew as Turner's expert after being subpoenaed to appear at that *Daubert* hearing.  Turner's counsel stated on the record that Dr. Summers withdrew because he was intimidated by the Attorney General's office and their investigators.  Around 5:00 p.m. on August 22, 2017, Turner attempted to designate Dr. William Truly as Turner's expert witness.  Turner disclosed that Dr. Truly would testify with opinions regarding Anderson's medical records.  For example, Dr. Truly would testify that Anderson's medical records were inconsistent with strangulation and that her medical records did not indicate that she exhibited signs of excessive trauma.  Dr. Truly also would testify that Anderson's physical exam was normal (except for the subconjunctival hemorrhage) and that Anderson's CT scan was normal (except for the non-specific hypodensity area in her brain that was of "indeterminate age").  By written order, the circuit court excluded Dr. Truly's designation, finding it was untimely.  Turner now asserts the circuit court erred by excluding Dr. Truly from testifying and by denying Turner a motion to continue.

¶37.    In the circuit court's "Order Concerning Pre-Trial Evidentiary Rulings," the court deemed Dr. Truly's expert designation as "clearly untimely" and in violation of Mississippi Rule of Criminal Procedure 16.1, which permits courts to set deadlines "for the filing and hearing of all pretrial motions."  In its order, the court stated:

> The designation of Dr. Truly at the ninth hour [was] simply not consistent with the pre-trial deadlines set forth in this matter, and the circumstances involving

18

the withdrawal of Dr. Timothy Summers as the timely designated defense expert d[id] not constitute good cause to allow an extension of the Court's pre-trial deadlines.

In response to this order, Turner filed a motion to continue the case on August 31, 2017. The basis for the motion was to provide Turner with extra time so that he could proceed to trial with an expert witness. The court denied that motion.

¶38. "In reviewing rulings of a trial court regarding matters of evidence, relevancy and discovery violations, the standard of review is abuse of discretion." *Montgomery v. State*, 891 So. 2d 179, 182 (¶6) (Miss. 2004) (citing *Conley v. State*, 790 So. 2d 773, 782 (¶20) (Miss. 2001)). This Court must determine "(1) whether such a violation occurred [and,] if so, (2) whether the exclusion of this evidence was an appropriate remedy." *Myers v. State*, 145 So. 3d 1143, 1147 (¶10) (Miss. 2014) (citing *Williams v. State*, 54 So. 3d 212, 213-14 (¶5) (Miss. 2011)).

¶39. A defendant has a constitutional right to call witnesses in his or her favor. *See* U.S. Const. amend. VI; Miss. Const. art. 3, § 26. However, a defendant also must meet certain discovery requirements regarding the testimony of witnesses. Rule 17 of the Mississippi Rules of Criminal Procedure governs discovery procedures in criminal cases. According to that rule, once the defendant asks for discovery from the State, the defendant must disclose to the State the "[n]ames and addresses of all witnesses in chief" he intends to call at trial. MRCrP 17.3(1). "Both the State and the defendant have a duty timely to supplement discovery." MRCrP 17.8. If, after initially complying with discovery procedures, "a party

19

discovers additional material or information which is subject to disclosure, that party shall promptly notify the other party," and if that evidence is discovered during trial, "the court shall also be notified." *Id.*

¶40. This Court generally defers to the trial court's ruling in cases where there is evidence that the defendant was dilatory in locating a witness or in disclosing the witness's identity. For example, in *Williams*, 54 So. 3d at 213 (¶1), the defendant was charged with shooting a man outside of a nightclub. The defendant claimed self-defense, and in support of that theory, he planned to call the bouncer as a witness who would testify that the victim was in possession of a gun on the night in question. *Id.* at (¶2). The trial court permitted the bouncer to testify that he heard the victim cursing at the defendant before the shooting and that he had seen the victim reach toward his back before the defendant fired, but "he was not allowed to testify that [the victim] had possessed a gun." *Id.* On appeal, our supreme court found that the trial court did not abuse its discretion in finding a discovery violation because the record indicated that due diligence may not have been exercised by the defendant during discovery. *Id.* at 214 (¶8). Specifically, the defendant's attorney admitted that he had not begun preparing for the case until one month before trial. *Id.*

¶41. Here, the record does not show that Turner's expert designation of Dr. Truly constituted a discovery violation because the record contains no expert-witness-designation deadline set by the court.

¶42. Mississippi Rule of Criminal Procedure 16.1(a) permits the court to "set a reasonable

20

deadline for the filing and hearing of all pretrial motions." The rule defines "[p]retrial motions" to "include, but [not be] limited to," motions: "to dismiss, to suppress evidence, to request discovery, for continuance, for severance, for appointment of experts, for mental examinations, or for any matters which may delay the trial." That rule does not explicitly include designations of experts. We note that expert designations are not required via motion practice. In particular to the order that set the motions deadlines, the parties were permitted to file pre-trial motions until noon on Friday, August 18, 2017. The parties were also ordered to submit "any written opposition to a timely filed motion" by noon on August 22, 2017. The order further required the parties to submit witness lists to the trial court by noon on August 29, 2017. Turner provided Dr. Truly's discovery disclosures and materials, which included his opinions that Anderson's medical records were inconsistent with strangulation, to the State and the court around 5:00 p.m. on August 22, 2017. That date was four days after the pre-trial motions deadline, but it was seven days prior to the witness-list deadline and fourteen days prior to trial. The court's pre-trial motions deadline encompassed various types of motions, such as ones "for continuance" and "for the appointment of experts," but not for designations of experts. As such, we find that the circuit court abused its discretion in finding that Turner committed a discovery violation by designating Dr. Truly on August 22, 2017, as his designation was timely filed prior to trial. But even if Dr. Truly's designation constituted a discovery-order violation, the trial court's remedy to deny Turner's motion to continue in order to obtain an expert witness was improper.

21

¶43. Prior to trial, if a party fails to timely disclose or comply with a discovery order, a trial judge's procedural remedies are governed by Mississippi Rule of Criminal Procedure 17.19(a). That rule provides:

> If, at any time prior to trial, it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order pursuant thereto, the court may [(1)] order such party to permit the discovery of material and information not previously disclosed, [(2)] grant a continuance, or [(3)] enter such other order as it deems just under the circumstances.

MRCrP 17.9(a). The weight of the sanction should be based on the motivation of the offending party in violating the discovery rule. *Coleman v. State*, 749 So. 2d 1003, 1009 (¶17) (Miss. 1999). Generally, the rule is that evidence must not be excluded. *Williams*, 54 So. 3d at 215 (¶10). But when the court determines that a discovery violation is "willful and motivated by a desire to obtain a tactical advantage," the exclusion of the evidence may be entirely proper. *Darby v. State*, 538 So. 2d 1168, 1170 (Miss. 1989) (quoting *Taylor v. Illinois*, 484 U.S. 400, 401 (1988)). This Court cannot disregard the "fundamental character of the defendant's right to offer the testimony of witnesses in his favor." *Coleman*, 749 So. 2d at 1009-10 (¶17) (quoting *Taylor*, 484 U.S. at 414).

¶44. In the instant case, the fact that Dr. Truly's testimony was recently discovered or supplemented (fourteen days before trial), by itself, is insufficient proof that the supposed discovery violation was "willful and motivated by a desire to obtain a tactical advantage," especially because Turner had previously disclosed discovery for Dr. Summers. *See Williams*, 54 So. 3d at 215 (¶10). Adding to the explanation case above, our supreme court

22

in *Williams* found sufficient evidence of a *discovery violation* where the defendant had failed to disclose a certain witness's testimony to the prosecution. *Id.* at 214 (¶9). But because the defendant had disclosed the identity of the witness, provided a partial summary of his testimony, and had disclosed the newly discovered testimony before the witness took the stand, the supreme court held that the untimeliness of such disclosure, alone, was insufficient to prove a willful discovery violation. *Id.* at 215 (¶13). The supreme court reasoned, "It would be a mistake to adopt a posture in which we assume that recently discovered evidence is part of some scheme to defraud justice and require the defendant to prove otherwise." *Id.*

¶45. Similar to *Williams*, we find that Turner's expert designation did not evince a willful discovery violation. First, we cannot find evidence in the record demonstrating that Turner's attorneys were attempting to hide Dr. Truly's identity from the State to gain a tactical advantage. In fact, the record exhibits the opposite. Before Dr. Summers withdrew, Turner's counsel tried to convince Dr. Summers not to withdraw and to testify on Turner's behalf. It was not until after these efforts fell short that Turner's counsel contacted Dr. Truly to see if his opinions would support Turner's theory that Anderson's injuries were inconsistent with domestic violence and strangulation. Second, Turner disclosed Dr. Truly fourteen days prior to trial, giving the prosecution an opportunity to prepare for his testimony. Further, the court seemed most concerned with the reliability of Dr. Truly's testimony. In its ruling, the circuit court found Dr. Truly's opinions "inherently unreliable" because Dr. Truly did not have "sufficient opportunity to study the issues" and because his curriculum vitae was insufficient.

23

¶46.    Our review for this reliability issue is guided by Mississippi Rule of Evidence 702 and *Daubert*, *supra*.  As mentioned above, Rule 702 requires experts' testimony to be both relevant and reliable.  M.R.E. 702.  First, we disagree with the circuit court that Dr. Truly did not have a "sufficient opportunity to study the issues."  The testimony of a physician is sufficiently reliable if his opinions are based on "his interpretation of medical records in light of his experience, training, and expertise as a qualified physician in his field of medicine." *Delta Reg'l Med. Ctr. v. Taylor*, 112 So. 3d 11, 27 (¶48) (Miss. Ct. App. 2011) (quoting *Hubbard By and Through Hubbard v. McDonald's Corp.*, 41 So. 3d 670, 678 (¶29) (Miss. 2010)).  Moreover, the law allows a qualified physician "to extrapolate causation testimony from the patient's clinical picture[s] even when the medical records contain no objective medical evidence establishing causation."  *Hubbard*, 41 So. 3d at 678 (¶27) (internal quotation marks omitted).  While only a short amount of time was available, Dr. Truly had ample time to form reliable opinions by basing his review of Anderson's medical records on his experience, training, and expertise as a family medicine medical doctor.  Rather than exclude Dr. Truly's testimony in its entirety, the circuit court should have permitted the State to cross-examine Dr. Truly and allow the jury to weigh other testimony against Dr. Truly's contradicting testimony.

¶47.    Second, the court found that Dr. Truly's curriculum vitae lacked "support for a finding that Dr. Truly [was] qualified or experienced to offer identical medical opinions to those of Dr. Summers, a psychiatrist."  The record shows that both experts were medical doctors at

24

the time of the proceedings. In particular, the record shows that Dr. Truly received his bachelor's degree from Howard University. He subsequently earned his medical degree from Meharry Medical College in 1970. Further, Dr. Truly had been employed as a physician since 1971. At the time of the trial proceedings, Dr. Truly was employed at the Claiborne County Hospital in Port Gibson. The record also demonstrates that Dr. Truly had testified as an expert witness in emergency medicine and family medicine in previous cases. *E.g.*, *Univ. Med. Ctr. v. Martin*, 994 So. 2d 740, 747-48 (¶¶3) (Miss. 2008). For this trial, Turner proffered Dr. Truly as an expert in the same areas. Finally, we note that Dr. Summers, Turner's initial expert witness, specialized in psychiatry, and that Dr. Truly's practice was in family medicine. Nevertheless, this distinction is immaterial for purposes of testifying in this case.

¶48. Because there is insufficient evidence that Turner's alleged violation was untimely, or that Turner sought to obtain a tactical advantage in the case, we find that the circuit court abused its discretion in excluding Dr. Truly's expert testimony.

¶49. We also find that Turner's defense was substantially prejudiced by the circuit court's exclusion of Dr. Truly's testimony. Mississippi appellate courts have found prejudice where a trial court excludes evidence that tended to support the defendant's theory of the case. *E.g.*, *Williams*, 54. So. 3d at 216 (¶14). The instant case featured sharply contrasting evidence with witnesses' credibility playing a critical role in the jury's determination. Absent the exclusion, Dr. Truly's testimony would have corroborated Stevenson's account about the

events that took place on the night in question. The evidence would have supported Turner's theory that Anderson's injuries were inconsistent with strangulation. From this evidence, the jury could have inferred that Anderson was not assaulted or strangled by Turner on the night in question. Therefore, since "[t]he accused in a criminal prosecution possesses a fundamental right to present witnesses in his own defense," we find that the circuit court abused its discretion in excluding Dr. Truly as Turner's expert witness. *Wright v. State*, 92 So. 3d 38, 44 (¶22) (Miss. Ct. App. 2012) (Carlton, J., dissenting). This determination requires reversal and remand.

### III. Public Trial

¶50. Before Anderson testified, the circuit court sua sponte closed the courtroom from the public. The court reasoned that the closure was proper due to the sensitive nature of the offense. Now, Turner claims that the court violated his right to a public trial. We agree.

¶51. The State contends that "Turner did not object to the trial court's decision to close the courtroom." The transcript reads:

BY THE COURT:   Any – any weigh-in from the defense?

[Defense Counsel]: I hadn't considered it, but I don't – I don't see the purpose. I mean, I hadn't considered it. I mean, whatever the Court wants.

BY THE COURT:   Hold on a second. . . . All right. Go ahead.

[Defense Counsel]: Why was the Court excluding them? They just thought it was too sensitive or –

BY THE COURT:   Well, it's – it's a sensitive topic. From what I've heard

26

> from opening statement, this was a domestic violence situation and – and it – I'm sensitive to a victim's testimony in situations like this.
>
> [Defense Counsel]: We object that it's a – that it's a domestic violence situation. We don't concede that. And – but if the Court wants to do that – I mean, *we object to that*.
>
> BY THE COURT: All right.

(Emphasis added).

¶52. We note that defense counsel's objection creates some confusion. The State considers Turner's objection to target the characterization of the offense, which is a reasonable deduction. Yet, after careful review, we find that not only did Turner object to the court's characterization of Turner's alleged crime, but trial counsel also objected to the court's own proposed motion to close the courtroom. Thus, our next step is to review whether such closure was proper.

¶53. The Sixth Amendment to the United States Constitution and Article 3, Section 26 of the Mississippi Constitution both provide the accused in a criminal prosecution the right to a public trial. "However, that right is not absolute, but instead must be balanced against other interests essential to the administration of justice." *Tillman v. State*, 947 So. 2d 993, 995 (¶7) (Miss. Ct. App. 2006) (quoting *Bailey v. State*, 729 So. 2d 1255, 1260 (¶24) (Miss. 1999)). Our State Constitution explicitly lists several instances where the exclusion of the public is authorized, including "prosecutions for rape, adultery, fornication, sodomy, or crimes against nature." Miss. Const. art. 3, § 26. In the seminal United States Supreme Court case *Waller*

27

*v. Georgia*, 467 U.S. 39 (1984), the Supreme Court established a test for determining whether a defendant's right to a public trial is outweighed by other considerations, holding:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Id.* at 48. The Mississippi Supreme Court adopted this test in *Gannett River States Publishing Co. v. Hand*, 571 So. 2d 941, 945 (Miss. 1990).

¶54. In *Presley v. Georgia*, 558 U.S. 209 (2010), the United States Supreme Court extended this line of cases and held, as a matter of federal constitutional law, that "trial courts are required to consider alternatives to closure even when they are not offered by the parties." *Id.* at 214. The Court stated that the obligation "to take every reasonable measure to accommodate public attendance at criminal trials" rests on the trial court, not the parties. *Id.* at 215.

¶55. Turner argues that the circuit court violated his constitutional right to a public trial by excluding the public from hearing Anderson's testimony and by considering no alternatives, as prescribed by *Presley*. In response, the State maintains that "[d]efense counsel offered no alternatives to closure, and did not allege that the trial court failed to make findings as required by *Waller*."

¶56. We preface our ruling by making it clear that this Court does not undervalue the seriousness or sensitive nature of this case, and we do not make light of the fact that the

28

incident could have caused Anderson some embarrassment before and throughout trial. A

defendant, however, "is constitutionally entitled to a public trial for whatever heinous act of

which he may be accused." *Pierce v. State*, 250 So. 3d 493, 497 (¶11) (Miss. Ct. App. 2018).

The circuit court had a duty to balance the interest in protecting the victim from unnecessary

embarrassment with the interest in complying with Turner's right to a public trial. Here, we

find that the circuit court, in executing that balance, erred in excluding the public during

Anderson's testimony. Anderson was a primary witness for the State. The only reason

offered by the State to exclude the public from Anderson's testimony was that the exclusion

was in accordance with the Mississippi Rules of Criminal Procedure.

¶57.    To support its decision to close the courtroom, the circuit court cited *Lee v. State*, 529

So. 2d 181 (Miss. 1988). In that case, a twenty-one-year-old female, majoring in church

vocations, was raped while attending college. *Id.* at 181-82. The issue before that court was

whether the trial judge abused his discretion in excluding the public from the trial without

making a finding that closure was necessary. *Id.* at 182. In a relatively short opinion, the

supreme court held that the trial judge did not abuse his discretion because "[t]he trial judge

held an evidentiary hearing and made findings sufficient to exclude members of the public

. . . during the victim's testimony." *Id.* at 183. "Further, court officials, the appellant, legal

counsel and, of course, the jury were never excluded from the courtroom." *Id.*

¶58.    *Lee* is distinguishable from the instant case. In *Lee*, the courtroom was closed during

the rape victim's testimony. In the instant case, the victim was not raped or sexually

assaulted. In the record, there is only a two-and-a-half page dialogue discussing whether to exclude the public from Anderson's testimony. Plus there is no evidence in the record that the circuit court considered alternatives. Further, Anderson's testimony was lengthy and pivotal to the State's case-in-chief. *See Pierce*, 250 So. 3d at 497 (¶11) (reversing and remanding because a one-minute video was not enough to exclude the public from the victim's *entire* testimony and because the trial judge did not consider alternatives to closing courtroom while the video played). Therefore, we find that the circuit court's reasoning for excluding the public from Anderson's testimony (because the testimony was sensitive and related to domestic violence) did not overcome Turner's constitutional right to a public trial, and, as such, the circuit court committed reversible error.

### IV.  Victim's Prior Bad Acts

¶59.  Turner also disputes the circuit court's decision to exclude evidence of Anderson's alleged violent behavior. Before trial, the court held a hearing to discuss several motions in limine filed by Turner and the State. In particular, the court excluded three pieces of evidence that Turner now disputes were excluded in error. In his brief, Turner argues that the circuit court (A) "prohibited Turner from impeaching Anderson's testimony" regarding "an incident [that occurred] in January of 2014"; (B) "excluded evidence of Freelon['s] surveillance video"; and (C) excluded Terrance Patton and Cloe Hall's witness testimony. This Court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion, but we apply de novo review to a trial court's analysis and application of the law.

30

*Richardson v. State*, 147 So. 3d 838, 841 (¶13) (Miss. 2014).

### A.     January 2014 Incident

¶60.    Turner claims that the circuit court erred by "prohibiting [him] from impeaching Anderson's testimony . . . about an incident in January of 2014 [in which] Anderson stalked Turner outside of his home and [the] police ordered/warned her not to trespass or stalk Turner."   The trial transcript reveals that during Anderson's cross-examination, Turner sought to impeach Anderson with a police report generated by the Clinton Police Department.   Sustaining the State's objection, the court denied Turner the opportunity to inquire into the police report, finding such evidence was an inadmissible prior bad act.

¶61.    In order to admit evidence concerning a victim's prior bad acts, the Mississippi Rules of Evidence instruct that such evidence must adhere to Rules 401 and 404.   Under Rule 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the case."   M.R.E. 401(a)-(b). Under Rule 404, evidence of a victim's character is generally irrelevant however, in limited circumstances, evidence of a victim's character may be relevant "where the defendant claims that the victim was the initial aggressor and that the defendant's actions were in the nature of self-defense."   M.R.E. 404 advisory committee note.   But "in order to present this evidence, the defendant must offer evidence of an overt act of aggression perpetrated against him by the victim."   *Rouster v. State*, 981 So. 2d 314, 319 (¶14) (Miss. Ct. App. 2007).

31

¶62. In *Rouster*, the defendant's attorney sought to introduce evidence on cross-examination about whether the victim of an alleged aggravated assault was intoxicated. *Id.* at 316 (¶7). At the time of the questioning, the district attorney objected and argued the testimony was irrelevant. The trial judge sustained the objection. *Id.* Finding that the trial judge did not abuse his discretion in excluding the testimony, this Court held that the victim's possible intoxication was not an exception to inadmissible character evidence because "at the time the defense counsel attempted to elicit [the] testimony, during the State's case-in-chief, the defendant had not established the victim as the initial aggressor or claimed self-defense, thus, it was irrelevant at that point in trial." *Id.*

¶63. Similar to *Rouster*, Turner's attorney attempted to elicit testimony concerning the specific incident from Anderson on cross-examination during the State's case-in-chief. At this point in the trial, Turner had not established Anderson as the initial aggressor because the questions Turner's counsel had asked in the cross-examination were questions concerning Anderson's characterization of her relationship with Turner. Therefore, this evidence was irrelevant at the time Turner attempted to admit it. This issue is without merit.

### B. Surveillance Video

¶64. Prior to trial, the State also moved in limine to exclude a two-minute surveillance video. The video depicted Anderson and a group of women "involved in a fight" in the Freelons's parking lot three years *after* the instant case's alleged incident. The circuit court granted the State's motion to exclude the evidence, finding it to have no probative value

32

regarding the allegations in the instant case. The court stated, "Even if [the video had probative value], it would be outweighed by the danger of confusing the jury."

¶65. As mentioned above, "evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the case." M.R.E. 401. A trial "court may exclude relevant evidence if its probative value is substantially outweighed by the danger of . . . misleading the jury . . . ." M.R.E. 403.

¶66. We find the circuit court did not abuse its discretion by excluding the video. The surveillance-video footage was taken in August 2017, which was over three years *after* the alleged events occurred in the instant case. Further, contrary to Turner's claim that the video depicted Anderson "involved in a fight," the circuit court found the video showed "a few women in the parking lot, who seem[ed] to be using slightly raised voices, but not 'fighting.'" Accordingly, this issue is without merit. *See Hester v. State*, 841 So. 2d 158, 163 (¶18) (Miss. Ct. App. 2002) (holding that proof of actual violent acts is admissible but that "idle threats" of actual violence are not").

### C. Terrance Patton and Cloe Hall's Lay Witness Testimony

¶67. After voir dire, the trial court took up the parties' final pre-trial issues. Turner proposed to call two lay witnesses, Terrance Patton and Cloe Hall, who would testify about certain prior bad acts Anderson committed and for impeachment purposes. The circuit court ruled:

33

BY THE COURT: . . . There's been no showing *so far* that the victim in this case was the initial aggressor. I say that because bad acts by the victim would not be admissible per my ruling. . . . Furthermore, I – I fail to see the – the relevance of whether or not she met him once or three times or five times. And – and this was all a long time before the subject incident, and I think it's a – it's a rabbit trail. And to the extent that it's relevant at all, I believe that its probative value is substantially outweighed by the danger of unfair prejudice to the State, per Rule 403. So that will be my ruling on that.

(Emphasis added). Similar to sub-part (A) concerning the January 2014 incident, we find that at the time Turner sought to introduce the witnesses' testimony, Turner had not presented any evidence that he acted in self-defense or that Anderson was the initial aggressor. *Rouster*, 981 So. 2d at 319 (¶15). Furthermore, Turner never attempted to call Patton or Hall after Stevenson testified, which, at that time, the proper predicate may have been laid. Therefore, since Turner made no attempt to present evidence about the specific instances after Stevenson's testimony, this issue is also without merit.

## V. Alleged Assault Against Separate Victim

¶68. At trial, Anderson testified that Turner assaulted Anthony Steele, the man who attempted to help Anderson by offering to retrieve her cellphone. Over Turner's objection, the State presented Anderson's testimony surrounding Steele's assault, and the circuit court permitted the State to present Steele's medical records, which the State claims "corroborated [Anderson's] claims." On appeal, Turner argues that such evidence violated Mississippi Rules of Evidence 401, 403, and 404. The State argues that Rule 404 did not prevent the

34

admission of evidence related to the separate crimes because both crimes were a part of the same transaction.

¶69. Under Rule 404(b), evidence is inadmissible if it seeks to introduce a prior bad act "to prove a person's character in order to show that on a particular occasion the person acted in accordance with that character." M.R.E. 404(b)(1). The "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." M.R.E. 404(b)(2). Further, "where another crime or acts is so interrelated to the charged crime so as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences, proof of the other crime or act is admissible." *Townsend v. State*, 681 So. 2d 497, 506 (Miss. 1996). The other crime must be "integrally related to time, place, and fact" to the crime for which the defendant is standing trial. *Id.* In essence, admission of this evidence must be necessary to tell a complete and coherent story and prevent confusing the jury. *Id.*

¶70. The State argues the assaults against both Anderson and Steele "occurred somewhat simultaneously," and both assaults were "integrally related to time, place, and fact." As such, the State argues that "[t]his Court should find that the evidence related to the assault on Steele was admissible because it showed the res gestae of Turner's criminal conduct." We agree with the State.

¶71. As defense counsel acknowledged to the judge, both assaults took place within the "same, roughly, half-hour window." In *Turnage v. State*, 752 So. 2d 1049 (Miss. Ct. App.

1999), a defendant alleged error in the admission of rebuttal testimony by a second victim that she had also suffered sexual abuse by the defendant simultaneously with the sexual abuse of the other victim, as charged in the indictment. *Id.* at 1051-52 (¶¶5-6). This Court, while recognizing the State's "legitimate interest in telling a rational and coherent story of what happened to the victim," held, "Because Turnage's acts, having been committed almost simultaneously, were intertwined . . . [t]he State was entitled, under these particular circumstances, to inform jurors of the abuse [the second victim] suffered at the hands of Turnage." *Id.* at 1053 (¶¶10-11).

¶72. The evidence of Turner's assault against Steele was relevant and admissible. Steele's medical records showed in the medical history that Steele was "assaulted with the back end of a gun" and "was struck multiple times to the head." After examination, the doctor assessed the final diagnosis as "assault by blunt trauma." Anderson testified that Steele told her he heard gun shots, which the court allowed as an excited utterance. Those pieces of evidence gave credibility to Anderson's testimony and an account of the events. The evidence also showed that Turner was behaving violently and aggressively during the entire transaction and, as asserted by the State, "present[ed] a complete picture of the res gestae of Turner's criminal conduct." *See David v. State*, 29 So. 3d 129, 131-32 (¶¶9-12) (Miss. Ct. App. 2010) (finding testimony by a witness about a confrontation with the defendant after the alleged charged crime was admissible at trial because "it was offered to show [the defendant's] state of mind" when the charged crime occurred). Because the evidence was

36

interrelated and necessary to tell a rationale and coherent story of what happened to Anderson, we find the circuit court did not err by ruling that this evidence was admissible.

### VI. Double Jeopardy

¶73. Turner argues by supplemental briefing that his aggravated-assault-with-a-weapon and shooting-into-an-occupied-vehicle convictions violate his Fifth Amendment right against double jeopardy. Turner also claims the imposed firearm-enhancement sentences violated his double-jeopardy protections.

¶74. It is well-settled that no person "shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ." U.S. Const. amend. V; *see also* Miss. Const. art. 3, § 22. This constitutional guarantee assures three separate protections: (1) protection from a second prosecution for the same offense after acquittal; (2) protection from a second prosecution for the same offense after conviction; and (3) protection from multiple punishments for the same offense. *United States v. Dixon*, 509 U.S. 688, 695-96 (1993). This case deals with the third protection.

¶75. To determine whether double-jeopardy protections apply, we look to the "same-elements" test prescribed by the United States Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). The *Blockburger* test instructs us to determine whether each offense contains an element not present in the other; if not, they are labeled the same offense for double-jeopardy purposes. *Powell v. State*, 806 So. 2d 1069, 1074 (¶8) (Miss. 2001).

¶76.    In applying the *Blockburger* test, we must look to the statues under which Turner was convicted.   Mississippi Code Annotated section 97-3-7(2)(a) (Rev. 2014) provides in pertinent part:

> A person is guilty of aggravated assault if he . . . (ii) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm[.]

Mississippi Code Annotated section 97-25-47 (Rev. 2014) provides:

> If any person or persons shall willfully shoot any firearms or hurl any missile at, or into, any . . . motor vehicle . . . , such person shall, upon conviction, be punished by a fine of not less than one hundred dollars ($100.00) nor more than two hundred fifty dollars ($250.00), or be committed to the custody of the department of corrections not less than one (1) year nor more than five (5) years, or by both such fine and imprisonment.

¶77.    In *Graves*, our supreme court held that there are elements in each of the above-listed offenses that are not contained in the other.  *Graves v. State*, 969 So. 2d 845, 848 (¶13) (Miss. 2007).  Applying the *Blockburger* test, the court stated: "To prove aggravated assault, no element requires proof of a firearm being shot into a vehicle.  To prove shooting into a vehicle, there is no requirement of proof of bodily injury." *Id.*  As such, the *Graves* court found the petitioner's double-jeopardy claim to be without merit. *Id.* at (¶15).

¶78.    Further, Turner claims that the imposition of the firearm-enhancement sentences under Mississippi Code annotated sections 97-37-37(2) (Rev. 2014) violated his double-jeopardy protection against multiple punishments for the same offense. Section 97-37-37(2) provides:

> Except to the extent that a greater minimum sentence is otherwise provided by any other provision of law, any convicted felon who uses or displays a firearm during the commission of any felony shall, in addition to the punishment

38

provided for such felony, be sentenced to an additional term of imprisonment in the custody of the Department of Corrections of ten (10) years, to run consecutively, not concurrently, which sentence shall not be reduced of suspended.

Miss. Code Ann. § 93-37-37(2).

¶79. Numerous courts in this State have held that sentence-enhancement statutes under which additional terms of imprisonment are imposed do not result in double-jeopardy violations. *See Taylor v. State*, 137 So. 3d 283, 288 (¶17) (Miss. 2014); *Mayers v. State*, 42 So. 3d 33, 45 (¶50) (Miss. Ct. App. 2010), *abrogated on other grounds by Sallie v. State*, 155 So. 3d 760, 764 (¶14) (Miss. 2015). The reason is because sentence enhancements do "not set out separate elements of the underlying felony." *Mayers*, 42 So. 3d at 45 (¶50). Instead, section 97-37-37(2) "merely imposes an elevated sentence for use or display of a firearm during the commission of a felony, and it does not delineate an independent substantive offence." *Taylor*, 137 So. 3d at 288 (¶17) (quoting *Lewis v. State*, 112 So. 3d 1092, 1096 (¶15) (Miss. Ct. App. 2013)). Therefore, this issue is without merit.

### VII. Turner's Bad Acts

¶80. After Stevenson testified in Turner's defense, the State sought to impeach Stevenson on cross-examination to show that she was "not a credible witness or that she was biased." Turner now takes issue with certain questions pertaining to a specific incident in which Stevenson called the police to her friend's house. The State's counsel and Stevenson engaged in the following exchange:

> [State]: Okay. And do you remember us questioning you about whether

or not you had ever seen [Turner] – and I believe the question was, "Have you ever seen him handle a gun?" And you said the only time you've ever seen him handle a gun was carrying it in the house from the car when y'all got home and back to the car when y'all went out somewhere.

[Stevenson]: Yes, I remember that.

[State]: And that's the only time you've ever see him handle a gun?

[Stevenson]: Yeah.

. . . .

[State]: Was [Turner] angry that night?

[Stevenson]: He seemed upset, yes.

[State]: And we asked you did he have a temper when we questioned you. And you said, "He does have a temper." Do you agree with me?

[Stevenson]: I agree.

[State]: All right. Have you ever – has he ever exhibited that temper on you?

[Stevenson]: I mean, we argue like any other couple, so yes.

. . . .

[State]: . . . Have you ever called the cops on [Turner]?

[Stevenson]: I've called to retrieve my things before.

[State]: Retrieve your things from where.

[Stevenson]: From his residence.

[State]: So you moved out and he wouldn't let you have your stuff?

40

[Stevenson]: It was my – my car was just on his property.

[State]: And you were scared to go get it?

[Stevenson]: I felt like I wanted to go get it, and I didn't have the keys to it. [The keys were] inside. And I felt like maybe I needed assistance to get inside because he wasn't there.

[State]: Okay. Have you ever called the police because you were afraid of what he might do, not just somebody who might be in his house?

. . . .

[Stevenson]: I think I've called whenever we got in an argument before.

[State]: But that's it, just because of an argument?

[Stevenson]: I mean, we argued, and I may have did some things out of spite.

[State]: I mean, I've got – me and my wife argue, but I've never called the cops on her. Have you ever called the cops on [Turner] because you feared for your own safety? That's what I'm asking you. It's a "yes" or "no" question.

[Stevenson]: No.

[State]: All right.

. . . .

[State]: . . . Have you ever called the police to [your friend's residence?]

[Stevenson]: Yes.

[State]: Why did you call them there?

[Stevenson]: I think we had got in an argument and – I don't know. We had got – we had got in an argument. I think I was at her house, and I think he had came – was going to come over and had came

41

over, something to that extent. I think he eventually came over, but we had an argument over the phone and I didn't want him to come there. So I had – I think I called the police.

[Defense Counsel]: Objection, Your Honor.

¶81. After the objection was raised, the judge removed the jury from the courtroom to allow the State to proffer testimony from Stevenson. During the proffer, Stevenson recalled an incident that took place on April 2, 2016. On that day, Stevenson witnessed Turner brandish a handgun from his car. Unaware of what was happening, Stevenson stated that she left the scene and went to a friend's house. Stevenson also recalled that she called the Jackson Police Department to her friend's house because Turner had followed her there. At the end of the proffer, the State asked Stevenson about a specific pre-trial interview in which she told investigators that she had only seen Turner with a gun on one occasion. In essence, the State showed that Stevenson had failed to disclose the April 2 incident to the State in the pre-trial interview.

¶82. After the proffer was completed, the circuit court ruled that the evidence was admissible testimony. The circuit court ruled that the evidence showed Stevenson's bias and that it was also "reflective of an inconsistent statement."

¶83. When the jury returned, the State asked Stevenson, "[I]sn't it true that . . . you said [in a pre-trial interview]" that the only time you saw Turner handle a gun was when he "t[ook] the gun from [his] car to the house?" Anderson replied that she did. The State also asked, "Isn't it true on April 2nd, 2016, two weeks before [that] interview . . . , you called the police

42

[on Turner after] you [saw Turner] take a gun from his car and . . . heard gunshots?" The State then asked, "You didn't tell [our investigators] about that [event] . . . , did you?" Anderson stated, "No, I did not."

¶84.    Under Mississippi Rule of Evidence 613(a),

> [w]hen examining a witness about the witness's prior statement, a party need not show it or disclose its contents to the witness. But the party must, on request, show it or disclose its contents to an adverse party's attorney.

¶85.    The record shows that Stevenson was answering questions on cross-examination regarding a pre-trial interview. This testimony is hearsay—statements made out of court and being used for the truth of the matter asserted—and cannot be used for substantive purposes. *See, e.g.*, *King v. State*, 994 So. 2d 890, 899-900 (¶32) (Miss. Ct. App. 2008) (allowing the State to introduce "unpurified" prior inconsistent statements as substantive evidence is improper). This testimony, however, may be used to impeach Stevenson. *See Moffett v. State*, 456 So. 2d 714, 719 (Miss. 1984) ("[U]nsworn prior inconsistent statements may be used for impeachment of the witnesses's credibility."), *abrogated on other grounds by Portis v. State*, 245 So. 3d 457, 470-71 (¶32) (Miss. 2018).

¶86.    After careful review of the record, we conclude that the circuit court did not abuse its discretion in permitting this evidence. It is clear the State presented the evidence solely for impeachment purposes. In the pre-trial interview, Stevenson failed to disclose the April 2 incident to the investigators. The State brought forth that incident on cross-examination, and Stevenson conceded to the inconsistency. As such, the court did not err.

## VIII. Hearsay

¶87.    Turner also argues that during the course of the trial, the court improperly admitted three pieces of hearsay evidence: (A) a notation written on a photo lineup; (B) Sherman Anderson's testimony regarding Anderson's statement to him that Turner had beaten and choked her; and (C) Anderson's recorded statement to police. Our standard of review is abuse of discretion. *Williams*, 54 So. 3d at 213 (¶5).

### A.    *Photo Lineup*

¶88.    Turner claims it was error for the circuit court to admit a notation written on a photo lineup. Hearsay is defined as a statement "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." M.R.E. 801(c). This includes written statements. M.R.E. 801(a). The notation written on the side of a photo lineup was hearsay. However, the record demonstrates that when the State offered the photo lineup into evidence, defense counsel failed to object. Further, defense counsel failed to object when the State asked the court if it could publish the photo lineup to the jury. It was not until Detective McNeal testified about the notations written on the lineup that defense counsel objected. The transcript provides:

[State]:            Did Ms. Anderson also write on [the photo lineup] what happened to her that night?

[Defense Counsel]: Objection, Your Honor. I haven't seen that.

[State]:            It's in evidence.

44

[Defense Counsel]:   Withdraw.  Withdraw.

BY THE COURT:   All right.  Y'all – y'all approach.

. . . .

BY THE COURT:   What's your –

[Defense Counsel]:   I thought he was just offering the photo.  I didn't know he was going to offer hearsay.  Talking about pay attention – it's in.

[State]:   It's in evidence.

BY THE COURT:   Well, it's – it's in.

[Defense Counsel]:   Well, it's written on.  It's clearly hearsay.

BY THE COURT:   All right. Well –

[Defense Counsel]:   It's in there.

BY THE COURT:   All right.  But I'll note it was in [the record] without objection.  Very well.

¶89.   A failure to make a contemporaneous objection waives an issue for appeal purposes. *Caston v. State*, 823 So. 2d 473, 502 (¶101) (Miss. 2002) (citing *Gatlin v. State*, 724 So. 2d 359, 369 (¶43) (Miss. 1998)).  Defense counsel's objection was made *after* the photo lineup was already admitted into evidence.  Therefore, this argument is waived.

### B.     *Anderson's Statement to Her Father*

¶90.   At trial, Anderson's father, Sherman, testified that his neighbor told him that Turner had "jumped on" and "beat" his daughter as they were helping Anderson into Sherman's home.  Turner objected to the admittance of this statement, but the court overruled the

objection, finding that the statement fit within the excited utterance hearsay exception. Turner does not argue on appeal that this ruling was erroneous. Turner thereafter raised a "continuing objection" on the basis of hearsay to the State's line of questioning on this issue, which the court granted. A few minutes later, Sherman testified that after Anderson returned from the hospital, she told him that "[Turner] beat her up . . . choked her, held her over a bridge, and . . . drove . . . her home." On appeal, Turner now seeks to employ his continuing objection to argue that the latter statement that Anderson made to her father was inadmissible hearsay and not an excited utterance.

¶91. After reviewing Turner's brief, it appears Turner is conflating the court's ruling of the former statement with the latter statement. The record clearly shows that the court ruled the *former* statement was an excited utterance. No objection was made to the *latter* statement. This raises two points of discussion.

¶92. First, because no contemporaneous objection was made to the latter statement, Turner's only way for preserving this issue for appeal rests on whether this Court recognizes his "continuing objection" as proper. But we need not determine this issue because even if this Court were to find Turner's continuing objection was proper, the admittance of the latter statement did not result in reversible error.

¶93. Assuming there was error, Turner's substantive rights were not obstructed. *See Bullard v. State*, 923 So. 2d 1043, 1046 (¶9) (Miss. Ct. App. 2005). At the time Sherman made the latter statement, the former statement was already admitted into evidence.

46

Accordingly, we will not reverse the result. *See Devance v. State*, 768 So. 2d 319, 323 (¶10) (Miss. Ct. App. 2000).

¶94. Second, Turner's one-page argument on this issue was used to contend that the latter statement was not an excited utterance. But the court did not rule on the latter statement because no contemporaneous objection was made. Again, the admittance of the latter statement did not result in reversible error. *See id*; *accord Rodgers v. State*, 166 So. 3d 537, 545 (¶15) (Miss. Ct. App. 2014) (citing *Flora v. State*, 925 So. 2d 797, 811 (¶42) (Miss. 2006)).

### C.    *Anderson's Pre-trial Statement*

¶95. During Anderson's cross-examination, Turner played portions of Anderson's pre-trial statement in an attempt to impeach her credibility. On re-direct, the State moved to introduce Anderson's entire recorded statement, excluding a portion at the end of the recording, citing Mississippi Rule of Evidence 801(d)(1)(B), and in the alternative, Rule 106. Turner objected to the admission of the entire recorded statement, arguing that there was no "recent fabrication." After hearing arguments from both parties, the circuit court permitted the introduction of the entire recorded statement, finding that there had been a "serious allegation of recent fabrication through[out] the cross-examination of th[e] witness." Now, Turner argues this admission violated Rule 801(d)(1)(B).

¶96. The introduction of a prior consistent statement is permitted under Rule 801(d)(1)(B) if:

> (1) the declarant has testified at the trial and been subject to cross-examination, (2) the testimony of the witness as to the prior statement was consistent with the declarant's testimony as a witness, [and] (3) the prior statement was offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

*Moss v. State*, 977 So. 2d 1201, 1207 (¶5) (Miss. Ct. App. 2007). Turner asserts that Anderson lied about the allegations of abuse from the beginning. In turn, Turner claims the circuit court violated the rule of evidence because there was no *recent* charge of fabrication, as Anderson had been lying since the onset of the investigation.

¶97. In his brief, Turner cites the holding of *Owens v. State*, 666 So. 2d 814 (Miss. 1995), to support his contention. The holding states that an admission of a prior consistent statement is error when the motive to fabricate existed prior to a victim's statement to a witness. *Owens*, 666 So. 2d at 815. However, a similar argument was raised and rejected in *Dandass v. State*, 233 So. 3d 856, 864 (¶17) (Miss. Ct. App. 2017), *cert. denied*, 230 So. 3d 1023 (Miss. 2017).

¶98. In *Dandass*, the defendant contended that the non-hearsay exclusion did not apply because the allegations against the defendant "were not a *recent* fabrication." *Id*. This Court disagreed with the defendant, finding that the defendant's case-in-chief focused on attacking the witness's credibility and that the defendant "sought to paint [the witness] as a liar who fabricated [her testimony against the defendant]." *Id*. at (¶18).

¶99. Similarly to *Dandass*, at the time the State introduced the statements about which Turner complained at trial, Anderson, the declarant, had already testified at trial to the events

48

that occurred on the day in question, fulfilling the first prong of the analysis. *Moss*, 977 So. 2d at 1207 (¶5). Second, Anderson's testimony at trial matched her testimony in the recorded statement, which satisfies the second prong. *Id.* Furthermore, Turner's case-in-chief focused on attacking Anderson's credibility. Upon review of the trial transcript, it is clear that Turner's defense theory attempted to paint Anderson as a liar and as a person who had shared a previous relationship with Turner and was therefore motivated to exaggerate the events in question in order to seek revenge against Turner. Examples of this theory are seen throughout Turner's cross-examination of Anderson:

[Defense Counsel]: Okay. But as far as this eye doctor, you admit to the ladies and gentlemen of the jury you were not telling the truth about that?

[Anderson]: I did not go to the eye doctor.

[Defense Counsel]: I'm just saying, the police said, "Hey, you were so injured. Did you have – did you follow up with any medical care after the hospital?" You said, "Oh, yeah. I went to see an eye doctor. I went to The Eye Care Clinic," right? And that was just not true? That was an untruth, right?

[Anderson]: Yes, sir.

[Defense Counsel]: And the reason you told that was because you wanted to appear more injured than you actually were, so you made it seem like you had to go follow up at the eye doctor and get inspected, when it wasn't true, right? Right?

[Anderson]: No, sir.

. . . .

49

| | |
|---|---|
| [Defense Counsel]: | You talk about injuries. You try to make them more serious. You had charge – you filed charges against him, correct? |
| [Anderson]: | Yes, sir. |
| . . . . | |
| [Defense Counsel]: | All right. When you were texting [Turner], you knew you were going to ultimately give these texts to the attorney general or prosecutor, right? |
| [Anderson]: | No, sir. |

As such, we find that the prior recorded statement was offered to rebut the direct and implied charges of recent fabrication against Anderson. *See Esco v. State*, 9 So. 3d 1156, 1162-63 (¶¶26-31) (Miss. Ct. App. 2008) (introducing the entire thirty-two page guilty plea colloquy in order to rebut charges of fabrication), *cert. denied*, 12 So. 3d 531 (Miss. 2009). Therefore, we cannot conclude that the circuit court abused its discretion when it allowed the prosecution to introduce Anderson's entire recorded statement.

## IX.    Special Prosecutor and Trial Judge's Recusal

¶100. In a supplemental brief to this Court, Turner argues the trial judge improperly appointed a special prosecutor to prosecute the instant case. In addition, Turner argues the trial judge should have recused himself. Regarding the appointment of a special prosecutor, we note that the district attorney had recused himself. On that issue, and the issue of recusal of the judge, we note that this case is reversed and remanded for other reasons. We therefore decline to review the issue of special appointment, though the appointment appears

50

warranted. Furthermore, as the original trial judge is no longer serving as a Hinds County Circuit Court judge and because the case is remanded, that issue is moot.

## CONCLUSION

¶101. Based on the foregoing, we reverse the convictions and sentences on each count because of our resolutions of issues I, II, and III. This case is remanded for a new trial.

¶102. **REVERSED AND REMANDED.**

**BARNES, C.J., WESTBROOKS, McDONALD AND C. WILSON, JJ., CONCUR. TINDELL AND LAWRENCE, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON AND J. WILSON, P.JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., NOT PARTICIPATING.**